WICHITA ROYALTY COMPANY ET AL. v. THE CITY NATIONAL
BANK OF WICHITA FALLS ET AL.

No. 6800. Decided December 11, 1935.
Rehearing overruled April 8, 1936.
(89 S. W., 2d Series, 394; 93 S. W., 2d Series, 143.)

*Kilgore & Rogers, J. T. Montgomery,* all of Wichita Falls, and *Black & Graves,* of Austin, for plaintiff in error.

The Bank having aided the trustee in making the transfers and having permitted him to check out the transferred funds for personal purposes, including payments of his debts to the Bank, participated in his wrong doing, as a matter of law. Knowing of these transactions the Bank was put upon inquiry concerning his purpose. The Bank knew as a matter of law that in the use of the powers vested in him, however broad, he had no authority to defraud the trust estate. American Lumber Sales Co. v. Fidelity Trust Co., 127 Maine, 65, 141 Atl., 102; Commercial Bank v. Jones, 18 Texas, 811; First National Bank v. Gaines, 121 Texas, 559, 50 S. W. (2d) 774; Bacon v. Wright, 52 S. W. (2d) 1111.

Limitation had not run. Security State Bank v. Burton, 10 S. W. (2d) 201; Williams v. Daniel, 30 S. W. (2d) 711; Alston v. Richardson, 51 Texas, 1.

*T. R. Boone, Bullington, Humphrey & King, Weeks, Morrow & Francis,* all of Wichita Falls, for defendant in error.

On counter-proposition to those of plaintiff in error, cites: Childs v. Empire Trust Co., 54 Fed. (2d) 981; Goldstein v. Union Natl. Bank, 109 Texas, 555, 213 S. W., 584; Nabours v. McCord, 97 Texas, 526; Skaggs v. Murchison, 63 Texas, 348; 2 Tex. Jur., 702.

MR. JUDGE TAYLOR of the Commission of Appeals delivered the opinion for the court.

Suit was by the City National Bank of Wichita Falls, defendant in error, against Wichita Royalty Company and E. E. Scannell, as its Trustee and individually. Recovery was sought by the Bank of a balance alleged to be due on two notes, one

executed, and the other endorsed, by the Royalty Company, together with foreclosure of liens on certain properties. The Royalty Company, through E. E. Scannell, Trustee, pleaded various defenses and filed its cross action against the Bank and impleaded J. T. Harrell, one of its principal officers, seeking from both recovery of the Company's alleged balance of deposit, less authorized charges against it. W. H. Peckham, individually and as Administrator of the estate of G. W. Peckham, deceased, and Flora A. Kemp and C. I. Francis, independent executors of the last will and testament of J. A. Kemp, deceased, were impleaded parties, brought into the case because of alleged transactions of W. H. Peckham and J. A. Kemp prior to his decease, with G. W. Peckham, relating to Marlboro, a real estate venture in which the parties were engaged in putting on a residence addition to the City of Wichita Falls.

The trial court instructed a verdict in favor of the Bank on the two notes, with foreclosure, and against the Royalty Company on its cross action, and denied recovery against the impleaded defendants. Upon appeal by the Royalty Company the judgment was affirmed by the Court of Civil Appeals by a divided court. 74 S. W. (2d) 662. The majority opinion is by Judge Dunklin, Judge Power filing a concurring, and Judge Lattimore a dissenting, opinion. Upon first consideration Chief Justice Conner and Justice Lattimore constituted a majority of the court and voted to reverse and remand, each filing an opinion, Judge Conner concurring in Justice Lattimore's dissent. Following the death of Judge Conner and the appointment of Judge Power, the first decision was reversed, Judge Power filing an opinion concurring in the opinion originally filed by Judge Dunklin and subsequently supplemented by him. 74 S. W. (2d) 682. Judge Lattimore adhered to his dissent as expressed in the opinion theretofore filed. 74 S. W. (2d) 682. Writ of error was granted on the application of the Royalty Company and E. E. Scannell, Trustee, "on the importance of the question" and notation was made that the case was to be submitted with Quanah, Acme & P. Ry. Co. v. Wichita State Bank and Trust Co., 61 S. W. (2d) 170, in which writ of error had theretofore been granted. The cases were submitted together before the Court and Commission sitting in banc.

The Royalty Company was organized in 1920 under a Declaration of Trust, in form a common law trust, membership in which is evidenced by certificates of interest. The certificate holders are referred to in the Declaration as Stockholders. They are about 1,300 in number and widely scattered. Briefly,

the Company is an association of persons who furnished the capital for a business to be operated for their joint account and for mutual profit, and to be conducted by a chosen agent or trustee who was specially empowered as set forth in a Declaration of Trust similar in essential respects to that involved in Thompson v. Schmitt, 115 Texas, 53, 274 S. W., 564. Its legal effect was to create a partnership in which the Trustees were managing agents, or partners, and such is the legal effect of the Declaration here involved, except that only one trustee is provided as managing agent. R. R. Robertson was the first trustee. Upon his resignation in 1923 G. W. Peckham was appointed in the manner set forth in the Declaration as his successor. A few days after Peckham's death, on November 7, 1929, E. E. Scannell was appointed trustee. Prior thereto and even before Peckham became trustee, Scannell had been the bookkeeper of the Company, and nominally, though not in reality, its secretary-treasurer. The business to be operated as set out in the Trust Declaration was to purchase and sell oil and gas royalties, and other oil and gas properties. No other purpose is set forth, or authorized. The Declaration stipulates that its affairs are "to be managed by one trustee"; that the trustee shall have full and exclusive authority to conduct the business of the Trust; to purchase, contract for, lease, or otherwise acquire, any property necessary or proper for the purpose of the Trust; to sell and convey all or any part of the property of the Trust; to borrow money on the credit of the Trust; and "if he deems advisable, to execute notes individually secured by a mortgage or deed of trust upon the property of the Company, and generally to do all things which in his judgment is necessary and prudent in the management and conduct of the business of the Company." The Trustee's powers are broad, but no authority is granted for their exercise other than to carry on the business of the Trust within its defined limits. He is empowered to "declare dividends from the net income of the Trust, and his decision as to the amount of dividends is final." No stipulation of the Declaration is susceptible of the construction that the trustee is privileged to use the trust property or credit for his own benefit. While he is to be held responsible, "only for his own wilful and corrupt breach of trust and not for any honest error of judgment," he has no interest in the Trust or its property other than a managing interest, and such interest as may be evidenced by a certificate of ownership. The Declaration provides that all investments made and all property acquired *"shall be made and held in the name of the Trustee*

*as such Trustee."* (Italics ours); also that "the Trustee shall hold all the funds and property now or hereafter held by, or paid to, or transferred or conveyed to him or his successor or successors as Trustee hereunder in trust for the purpose, with the powers and subject to the limitations" therein declared, *"for the benefit of the cestui que trustent."* (Italics ours).

The Trust through an arrangement made between the Bank and Peckham as Trustee, carried with the Bank in its own name, Wichita Royalty Company, a deposit account. G. W. Peckham also had in the Bank a deposit account individually throughout the period of his trusteeship. The Trust had a liability record with the Bank, borrowing from it and repaying to it money through Peckham as Trustee from time to time. Likewise Peckham had an individual liability record with the Bank, borrowing and repaying in part from time to time. Also Peckham was engaged in part individually in the same business as the Trust, and throughout the period involved bought and sold in that business on his own account.

The statement of facts contains more than 1100 pages, but it, together with a statement of the pleadings, is sufficiently summarized in the majority and minority opinions of the Court of Civil Appeals in connection with the questions there discussed, to serve as a basis for decision of the questions before us. Reference is made to the summation referred to, as a restatement would unduly prolong this opinion.

The questions presented grow out of transactions between the Bank and the Trustee, Peckham, and involve transactions of the Trustee with the Bank and certain of its officials which touched and affected the interests of the Trust; also transactions and acts of Scannell as Trustee, with the Bank and its officials after Peckham's death. The case involves primarily a series of transactions carried out in the same way over a long period of time during which Peckham, by means of his checks as Trustee, payable usually to the Bank, transferred large sums of money from the Trust account into his active individual account, whence he checked it out by means of checks signed by him personally, largely for non-Trust purposes.

These transactions lie at the very foundation of the Bank's case, and will be stated in their chronological order rather than in the order pleaded. For nearly two years, so far as the record reveals, Peckham, as Trustee, had observed in his banking operations the requirement of the Trust Declaration that all property of the Trust shall be held in the name of the trustee as such. On October 8, 1925, he began a system of operation

with respects to the deposit account of the Trust in violation of that requirement by causing a transfer of $5,500 to be made from the Trust account to his own individual account in the same bank. Generally speaking the transfers were made by means of what is known as voucher checks. The statement of the majority opinion of the Court of Civil Appeals relating to the transfers reads:

"During the period beginning October 8th, 1925, and ending November 12, 1929, Geo. W. Peckham drew 49 checks on funds deposited in plaintiff bank to the credit of the Wichita Royalty Company, aggregating the sum of $134,712.14, the checks being signed by him as trustee for the Royalty Company, and after his death seven additional checks were drawn on the same account by Scannell, the substitute trustee, aggregating $10,-055.42. Forty-five of the checks drawn by Peckham, aggregating $119,473.98, were made payable to the bank, and 4, totalling $9,238.16, in favor of Peckham, personally, and for those 49 checks which he deposited he was given personal credit on the books of the bank. * * * Peckham also received credit on his personal account for $6,000 realized from oil investments belonging to the Royalty Company which had theretofore been deposited to his personal credit in the Security National Bank."

Most of the checks used in making the transfers were voucher checks, and when issued showed on the attached vouchers that they were in payment of the items noted thereon. The following is typical of the form used:

REMITTANCE ADVICE
　　Attached hereto is our check in full settlement of the items listed below. If not correct please return with explanation.

| Description | Detail | Total |
|---|---|---|
| NOTES PAYABLE: | | |
| To apply on note held by City National Bank | | $1,500.00 |

　　Detach here before depositing check.

------------------------------ (Perforation) ------------------------------

WICHITA ROYALTY COMPANY
Wichita Falls, Texas
August 16, 1927

When properly endorsed　　　　　　　　　　　　No. 635
Pay to the order of City National Bank　　　　$1,500.00
Exactly One Thousand Five Hundred Dollars no cents.
To the City National Bank
Wichita Falls, Texas.　　　　WICHITA ROYALTY COMPANY
　　　　　　　　　　　　　　　By G. W. Peckham
　　　　　　　　　　　　　　　　　　Trustee."

On the back of the lower half of the checks were printed above the usual place of endorsement these words: "Endorsement hereon by the payee constitutes acknowledgment of full payment of the items listed on the accompanying remittance statement. No other receipt required." Peckham requested the tellers handling the deposits of these checks to give him credit individually for the proceeds, which was done. No reason is given by the Bank or any of its officials for dealing with the Trustee and the Trust account in the manner detailed other than a desire to comply with the personal request of Peckham in whom they reposed confidence. As stated by vice-president Harrell in response to an inquiry in this connection: "We would endeavor to comply with the wishes of the customer." The vouchers were detached from the checks before presentment, and the Bank gave Peckham's personal account credit for the proceeds solely upon his request, and did so without inquiry or investigation on its part, or any showing of authority whatsoever on Peckham's part.

In the manner stated above the funds of the Trust and those of Peckham were commingled in his personal account. Nor is it material so far as the result is concerned that the checks used in making the transfers were in some instances payable to the Bank, and in some instances to Peckham himself, as the result of the transactions was to destroy the evidence of the stockholders' title to their moneys standing in the name of Wichita Royalty Company and to substitute for it evidence of the Trustee's personal title. This result was accomplished by the co-operative acts of Peckham and the Bank with knowledge on the part of the Bank that the Trust funds were being commingled with those of Peckham, and with further knowledge that a part of the property of the Trust was being held and carried in the name of the Trustee personally and not as trustee.

It is not important as bearing on the questions involved that Peckham could have drawn checks on the Trust account and cashed them, and deposited the proceeds in his personal account, thus accomplishing the same result. He did not use this method of getting control of the Trust funds, by which the Bank would not have been connected with the misappropriation; but used the method stated above, which connected the Bank with it. The dissimilarity of the two methods from the standpoint of legal significance is pointed out in the Quanah Acme & P. Ry. Co. v. Wichita Falls B. & T. Co., 127 Texas, 407, 89 S. W. (2d) 385 (opinion this day adopted), in which Toronto Club

v. Dominion Bank, 25 Ont. L. Rep., 330; Broadway v. Bushwick Natl. Bank, 216 N. Y. S., 713, and Underwood Ltd. v. Bank of Liverpool, 1 K. B., 775 (1924), are cited.

Further facts in connection with the manner of operating the two accounts disclose that from October 8, 1925, the date when Peckham made his first transfer of Trust funds to his personal account, throughout the entire period involved, he continued making similar transfers from time to time and the Bank continued its participation with him in so doing. The operations of Peckham were not confined to effecting with the Bank's acquiescence the transfer of large sums of the Trust money to his personal account, and in thus commingling the Trust property with his own in his individual account. The majority opinion of the Court of Civil Appeals in detailing the further operations with respect to the withdrawal and application of the commingled funds, says:

"Most of the 57 checks on which the cross action was based were made payable to the bank while others were made payable to Peckham, but all of them were given in payment for oil royalties, investments and improvements in the Marlboro Addition and as payments on outstanding promissory notes and they were all so applied. The checks so given for investments and improvements in the Marlboro Addition and covering one-half of the total amount of such investments aggregated $55,719.44. The checks applied to investments in oil royalties and oil properties aggregated $57,240.00. Thirty-three of the checks were given as payments on promissory notes, of which 26, aggregating $23,751.75, were drawn by G. W. Peckham, and 7 * * * aggregating $10,055.42, were drawn by Scannell as trustee after Peckham's death. Some of the checks so given by Scannell were applied on the Royalty Company's notes to the Bank given for the two loans above mentioned, and the rest as payments on the Marlboro Addition notes. Nineteen of the checks drawn by Peckham were likewise applied as payments on the same notes; but seven of them, * * * aggregating $10,750.00, were credited on the books of the bank as payments on Peckham's personal notes. The evidence showed that prior to the date of check No. 584 Peckham had paid to the Royalty Company $500.00 to be applied on the Royalty Company's notes to the bank. And the books of the Royalty Company showed that Peckham had been given further credits on his account with the Company as follows: August 31, 1927, for $500.00 to be applied on the Company's notes to the bank; October 9, 1927, for $1336.00; November 25, 1927, for $1500.00, to be used in

payment of the Royalty Company's note to the bank; and February 15, 1928, for $3485.00. Those five items aggregate $7321.00 and if it be said that the 7 checks show payments to the bank of trust funds on Peckham's personal debts to the bank, then, as insisted by the bank, we believe there should be deducted therefrom $7321.00 shown above, leaving a balance of $3429.00 only.

"Whether or not on the cross action those 7 checks or at least that balance of $3429.00 was chargeable to the bank as trust funds received by it on Peckham's personal indebtedness, with right of appellants to recover therefor, it is unnecessary for us to decide, since it is my conclusion that at all events appellants' demand therefor was barred by the statute of limitation hereinafter discussed."

The minority opinion, referring to the further operations in connection with the checking out of the funds in the commingled account, says:

"Peckham used a large sum of the trust funds to pay his personal obligations to the appellee bank and to Harrell and Basham, officials of the bank. Counsel for appellees in their briefs practically admit that same was slightly more than $7,000. Appellant contends it was more than $57,000. We shall not attempt to reconcile that difference."

Defendants in error say in their supplemental brief that:

"By carefully checking and rechecking, it will be found that of this $57,000 not over $2,000 may be traced to moneys which he took from the Wichita Royalty Company account and placed in his own account and then subsequently applied upon his indebtedness."

It appears conclusively that shortly after Peckham began making the transfers of Trust funds to his personal account he began making payments on his personal indebtedness to the Bank out of the commingled funds. It is undisputed that on October 8, 1925, Peckham made his first transfer of Trust funds. On that date by a check made payable to the order of the Bank he transferred $5,500.00 from the Trust account into his personal account. There is no evidence of any balance standing to his credit in his account at that time, or of any other deposit of funds credited to his account between the date of the transfer and November 17, 1925. On the last named date Peckham made his first payment out of his personal account to be applied on his personal indebtedness to the Bank.

■ The rule that the acceptance of payments from trust funds by a creditor to be applied on its debt establishes actionable

participation by the creditor in the wrongdoing of the debtor, is definitely established and recognized in this State, as well as in other jurisdictions and by leading text writers. United States Fid. & Guar. Co. v. Adoue & Lobit, 104 Texas, 379, 137 S. W., 648; Interstate National Bank v. Claxton, 97 Texas, 569. 80 S. W., 604, 65 L. R. A., 820; Bischoff v. Yorkville Bank, 218 N. Y., 106, 112 N. E., 759; Allen v. Puritan Trust Co., 211 Mass., 409, 97 N. E., 916; Massachusetts Bonding Co. v. Standard Trust etc. Bank, 334 Ill., 494, 166 N. E., 123, 126; Havana Central R. R. Co. v. Central Trust Co., 204 Fed., 546; State v. American State Bank, 108 Neb., 129, 187 N. W., 769; Ward v. City Trust Co., 192 N. Y., 61, 84 N. E., 585; Bogart, Trusts and Trustees, Vol. 4, Sections 907, 912; Morse on Banks and Banking (6 ed.), Vol. 1, Section 317; Perry on Trusts and Trustees (7 ed.), Vol. 11, Section 828.

The rule is clearly recognized in the Claxton case, supra, by Justice Williams, speaking for the court as follows:

"This case is to be distinguished from those in which a bank undertakes to acquire title to, an interest in, or benefit from a fund held in trust by a depositor. In attempting to acquire such a right or benefit the bank becomes a party to the action of the trustee and stands as any other person dealing with one holding property in a fiduciary capacity. The question of notice of the title of the person holding the property and his power over it arises, and a bank cannot any more than any other person acquire that which belongs in equity to another, if it have notice of his rights; and if it thus aid a trustee in diverting trust property from the beneficiary, it becomes liable as wrongdoer."

Bogert in the section of his recent work cited above states that:

"If a creditor of the trustee in his personal capacity, and not as trustee, * * * accepts from the trustee * * * commercial paper which runs to the trustee * * * as payee * * * in payment of the personal debt of the trustee, the creditor is deemed a participator in a breach of trust by the trustee if there was no authority to use the trust credit or paper for such private purpose."

In the same section the author states that the rule is applicable where the bank accepts in payment of its debt the trustee's checks drawn on an account known to the bank to contain both private and trust funds, citing, among other cases, United States Fid. & Guar. Co. v. Adoue & Lobit, supra, and Bischoff v. Yorkville Bank, supra.

In the Adoue & Lobit case the bank, after receiving payment of a debt owing to it by a fiduciary from a fund deposited with it by the fiduciary (guardian) in such manner as to charge the bank with knowledge of its trust character, placed to the personal credit of the fiduciary the remainder of that fund in the sum of $5,000. Thereafter, the bank on the fiduciary's individual check paid out the remaining balance to his brother. Justice Ramsey, who wrote the very able opinion in the case, quoting therein from Gray v. Johnston, L. R., 3 Eng. & Ir. App., 1, as bearing upon the question of participation by the bank, says:

"It has been very well settled that, if an executor or a trustee who is indebted to a banker, or to another person having the legal custody of the assets of a trust estate, applies a portion of them in the payment of his own debt to the individual having that custody, the individual receiving the debt has at once not only abundant proof of the breach of trust, *but participates in it for his own personal benefits.*" (Italics ours).

Justice Ramsey, speaking further for the court in holding the Bank liable, says:

"The principal question in the case is, Were Adoue & Lobit (a private bank) charged with notice of the trust character of the funds in question, *and were their acts and conduct in relation to same such as to render them liable?* This we think must be answered in the affirmative. Such was clearly the effect and fair purport of the decision of this court rendered on the 22d of January, 1908, in the case of Moore v. Hanscom, 101 Tex., 293, 106 S. W., 876. The facts of that case, so far as essential to a decision by us now, are practically identical with the facts in the present record. It was there said: 'When Compton deposited in the bank of Adoue & Lobit the sum of money due to the estate of Menard James, and the money was entered to the credit of A. J. Compton, guardian, the fund so deposited became the money and property of the ward's estate. Anderson v. Walker, 93 Tex., 119, 53 S. W., 821; Skipwith v. Hurt, 94 Tex., 322, 60 S. W., 423. Lobit testified that the bank would have paid the money on presentation of the certificate of deposit by Compton, or by any person holding it with Compton's endorsement on it. Adoue & Lobit were notified by the fact that Compton made the deposit as guardian that the money belonged to the estate of the ward, and they would not lawfully pay it to any person except by Compton's order, and then only for the uses of the estate; that is, they could not have knowingly applied the money in their hands to the payment of

any order made by Compton in any other character than that of guardian, nor could they have applied the money to the payment of any debt due from Compton personally to them or to any other person. * * * in the absence of *notice* or knowledge, a bank can not question the right of its customer to withdraw funds, nor refuse (except in the instances already noted) to honor his demands by check, and therefore, even though the deposit be to the customer's credit in trust, the bank is under no obligation to look after the appropriation of the trust funds when withdrawn, or to protect the trust by setting up a jus tertii against a demand. *But if the bank has notice or knwoledge that a breach of the trust is being committed by an improper withdrawal of funds, or if it participates in the profits or fruits of the fraud, then it will be undoubtedly liable."* (All italics in excerpt ours).

It will be noted that the Bank in the Adoue & Lobit case was held liable not only for that part of the trust fund received in payment of the fiduciary's debt, but also for the $5,000 thereafter checked out by him to another. The court on rehearing expressly refused to give controlling effect to the bank's receiving part of the fund, basing the recovery of the $5,000 upon the sole ground that the act of the bank in placing the trust funds to the personal account of the fiduciary, whence they were checked out for other than a trust purpose, was "obviously wrongful" and that the bank "must bear the resulting consequences."

The Bank complains that the rule is harsh in view of the ratio between the amount of business tranacted and the amount of Peckham's default, and urges that it did not have actual knowledge of the defalcations. It can not be heard to say after participation in Peckham's wrong to its own substantial advantage that the benefit received was relatively small, or that it was not consciously participating with him.

The facts are stronger against the Bank touching its participation with the fiduciary in the present case than in the case discussed. With frequency when the balance in the commingled account would reach the point where an overdraft was threatened, Peckham would make transfers of Trust funds in amounts more than sufficient to cover, and would continue the issuance of checks which the Bank continued to apply as credits on his indebtedness and on obligations created by him for other than Trust purposes. It is not essential to liability on the Bank's part on the theory of participation that it have had actual knowledge, or for it to have colluded with Peckham to despoil the

Trust. The record discloses conclusively that the Bank accepted payments to apply on Peckham's personal debts, and that it continued receiving such payments from the proceeds of his check drawn on his account containing Trust funds which he had commingled with his own.

■ The legal consequences of such transactions are clearly stated in Steere v. Stockyards Natl. Bank, 113 Texas, 287, 256 S. W., 586, 258 S. W., 1042, a case upon certified question in which Herbert Graves' Commission Company was trustee for the owners of cattle sold on commission. One of the questions certified was whether knowledge of the bank that a part of the proceeds deposited by Graves in the course of his business as commission merchant was the proceeds of cattle sold for individual shippers, had the effect to place upon the bank the burden of ascertaining for itself the persons to whom the trust funds in fact belonged, and hence render unauthorized the offsets made by the bank in liquidation of the Commission Company's overdrafts. The court says:

"We are clearly of the view that the actual knowledge on the part of this bank that the Graves deposit consisted, *in part,* of trust funds placed upon the bank the burden of making inquiry before appropriating any of that deposit in payment of its own overdraft against Graves. If all of the Graves' deposit had belonged to the shippers, within the knowledge of the bank, the latter certainly could not have appropriated any of the funds to its overdraft against Graves. The bank, knowing the deposit contained trust funds, must separate the trust funds in said deposit from the Graves funds therein before it makes an appropriation from the deposit to pay the Graves overdraft. The funds were mixed by Graves. The bank knew they were mixed. Therefore, under a rule as old as the law itself, the entire deposit will be treated as trust funds except so far as the bank might, upon inquiry, be able to distinguish the trust funds in said deposit from those therein belonging to Graves personally. In the case of Central Natl. Bank v. Connecticut Mut. Ins. Co., 104 U. S., 67, the Supreme Court of the United States quotes with approval the following:

" 'If a man mixes trust funds with his own the whole will be treated as the trust property except so far as he may be able to distinguish what is his own.'

"Before Graves or the bank could appropriate any part of the Graves deposit to the debt of Graves to the bank it was necessary that they take steps to ascertain what part of the Graves deposit belonged to Graves personally. In other words,

actual knowledge on the part of the bank that much of the Graves deposit consisted of trust funds was sufficient to put the bank upon inquiry to ascertain just what part so consisted before using any part of it in payment of Graves' overdraft to it."

In the case of Bischoff v. Yorkville Bank, supra, only two checks, one for $765 and the other for $1,000 were drawn on the account and applied to the debt due the bank. The bank received only $1765 to be applied on executor's debt to it, but was held liable for $12,000 principal, and $3,000 interest. It was held liable for every check drawn on the commingled account after it received the first payment on its debt, some of which were issued and presented more than 3 years after the first application so made.

The New York Court of Appeals in holding the bank liable says:

"In the present case Poggenburg paid to the defendant, as his creditor, on June 3, 1908, the sum of $765 from his account with the defendant. The finding of the trial court, supported by the evidence, is that the account at that time was constituted wholly from the trust funds. At that time and through the transaction the defendant knew that Poggenburg had appropriated $765 of those funds for his private benefit. The presumption that he would not thus violate his duty and lawful right—that he would apply the moneys to their proper purposes under the will—then ceased to exist. There was absolute proof in the possession of the defendant to the contrary. The defendant had no longer the right to assume that in paying the checks of Poggenburg it was paying the executor's moneys to the executor and not to Poggenburg, the individual, or that Poggenburg would use the moneys lawfully. It had knowledge of such facts as would reasonably cause it to think and believe that Poggenburg was using the moneys of the executor for his individual advantage and purposes. Those facts indicated that the payment to it was not an isolated incident; they indicated, rather, that it was within a method or system. Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion. Having such knowledge, it was charged by the law to take the reasonable steps or action essential to keep it from paying to Poggenburg as his own the moneys which were not his and were the executor's, and was bound by the information which it could have obtained if an inquiry on its part had been pushed until the truth had been ascertained. It did nothing of that sort, and by supinely pay-

ing, under the facts here, as found, the subsequent checks of Poggenburg, it became a privy to the misapplication. It must now pay the plaintiffs the moneys of the estate which it had and received on and after June 3, 1908."

Bank v. Claxton, supra, on the point invoked by the Bank that a depositor, although holding the money in a fiduciary capacity, "may draw it out of the Bank ad libitum," is distinguishable from the present case in that there the agents were authorized to carry the trust funds in the bank in their names personally. Justice Williams in making the distinction says: "The present case is not one in which the deposit was made to the credit of the agents without authority." Other cases involving the same distinction are: Wagner Trading Co. v. Battery Park Natl. Bank, 228 N. Y., 37, 126 N. E., 347; Robbins v. Passaic National Bank, 109 N. J. L., 250, 160 Atl., 418, 82 A. L. R., 1368; Underwood, Ltd. v. Bank of Liverpool (1924), 1 K. B., 775; Chase & Company v. Norkfork Natl. Bank, 151 Va., 1040, 145 N. E., 725, 730; McIntosh v. Detroit Savings Bank, 247 Mich., 10, 225 N. W., 628; Wen Kroy Realty Co. v. Public Natl. Bank & Trust Co., 260 N. Y., 84, 183 N. E., 73; Singer Sewing Machine Co. v. Citizens' Natl. Bank, 111 N. J. L., 199, 168 Atl., 32, 33; Ward v. City Trust Co., 192 N. Y., 61, 84 N. E., 585.

It is unnecessary for us to determine whether observance of the provisions of the Uniform Fiduciaries Act would necessitate the application of a different rule, as the Act has not been adopted by the legislature of this State. The rule applied has been established by the Supreme Court, and we recognize it as the better rule. Coleman v. First Natl. Bank, 94 Texas, 607, 63 S. W., 867, cited by the Court of Civil Appeals is distinguishable not only on the ground that the agent there had the right to make the deposits in question, but also upon the ground that the bank did not participate in any misapplication of the trust funds. The cases relied on by counsel for the Bank, holding on the particular facts of those cases that liability can not be predicated upon the crediting of trust funds to the trustee's personal account, are distinguishable for the reason among others that in none of them was the transfer credited after the bank had been guilty of participating with the trustee in a known breach of trust.

In the present case the Bank, after being charged with knowledge of Peckham's dishonest dealings, continued to credit Peckham's personal account with checks drawn on the Trust account, and persisted in its course of dealings with respect to

the two accounts. Having incurred the burden of ascertaining whether subsequent expenditures made by the Trustee from the commingled funds were for authorized Trust purposes, it cannot effectively complain of the weight of that burden. Bogert, Trusts and Trustees, Sec. 912, supra, in concluding his discussion of the Yorkville Bank case, which he approves, says:

"On principle it would seem that an honest and diligent bank ought to refuse the tender of trust credit in payment of a personal debt of the trustee, or, if it can reconcile the acceptance of such credit with appropriate standards of ethics, it should at least notify the cestui of the trustee's conduct and refuse to carry the account further. If it is willing to go on transacting business with a representative known to be dishonest and is not willing to warn the cestui, it should bear the heavy burden of seeing to the honesty of his future acts."

The same thought is expressed by the Supreme Court in the Adoue & Lobit case in the statement that the Bank, "with knowledge of the trust character of the funds," having permitted "a diversion thereof and aided in appropriation of same to the trustee's personal debt," * * * "is and of right should be held liable."

■ Peckham as Trustee drew checks upon the commingled account aggregating $53,740.89 purporting to be in payment of oil royalties and oil properties purchased by the Trust. The transactions represented by this group of checks are those in which Peckham bought properties on his own account and later sold them to the Trust, sometimes at a profit to himself. Another group of checks issued by Peckham aggregating $55,-219.44. He caused voucher notations and trust book entries to show the application of these funds to be for the purchase and improvement of a town-lot enterprise known as Marlboro. A clear statement of the transactions of Peckham, Harrell and the Bank relating to this enterprise is made in the minority opinion of the Court of Civil Appeals. 74 S. W. (2d) pp. 677-8. Peckham's deed purporting to convey the Marlboro property to the Trust was not delivered by Scannell, and title to the property was never accepted by the Trust.

Peckham received credit for checks aggregating $11,250.00 which carried voucher statements that the proceeds were to be applied to the Trust notes to the Bank. They were not so applied, and the Trust received nothing for them. Items in the total sum of $12,048.00 were received by Peckham from the sale of Trust royalties, but the books showed the sale prices to be still receivable from the purchasers. Six thousand dollars

was received also by Peckham through the security National Bank item. All of these improper withdrawals and misapplications of Trust funds took place after the Bank had participated with Peckham by accepting Trust funds on his personal debts to the Bank and after Harrell was charged with knowledge thereof. Checks aggregating $10,055.42 were drawn by Scannell after Peckham's death, and as his successor. It was not necessary, in order to establish participation of the Bank and Harrell with Peckham, to show actual knowledge on their part of Peckham's purposes as they relate to the various transactions in question. Steere v. Stockyards Natl. Bank, supra. The Bank and Harrell had constructive knowledge of Peckham's dishonesty, and inquiry pursued with reasonable diligence would have disclosed the facts showing Peckham's lack of authority and breaches of trust. First Natl. Bank of Houston v. Weiner, 253 S. W., 615; Miller & Co. v. Hobdy, 159 S. W., 96; Carder v. McPherson, 152 Fed., 951; Essex Natl. Bank v. Hurley, 16 Fed. (2d) 427.

Finally Scannell repudiated the transactions here in question, including those in which he himself acted as Peckham's successor, and concerning which he claims he had not at that time discovered either the true facts, or the rights of the stockholders. The cross action against the Bank and Harrell in which the repudiations are set up and tenders are made, was filed less than two years after Peckham's death.

It is the position of defendants in error with respect to Scannell's repudiation of Peckham's transactions, including those had with Harrell, that he had so conducted himself with respect thereto that he had no right to repudiate them, and that if he was not in position to personally complain, then the stockholders cannot assert their rights through him as their representative. Defendants in error also urge as defenses, ratification and limitation.

■ It must be borne in mind that as to the stockholders the cause of action is not asserted by Peckham on his behalf and for all others similarly situated. Scannell, as Trustee, is asserting the facts set up in the cross action and in defense of the Bank's suit, as the representative of the stockholders, and in so doing acts in a representative capacity. As showing the distinction between the individual right of a trustee and his representative right in respect to his right to sue for the cestui que trustent, it is stated in Perry on Trusts (7 ed.), Sec. 122, Vol. 1, p. 178, that "the trustee also may recover the funds notwithstanding his own fraud." It was not only his right but his

duty to assert the cross action for the trust estate to recover property disposed of in fraud of the trust. It is settled that one receiving property with knowledge that it is subject to a trust and that it had been transferred in violation of the trustee's duty, takes it subject to the rights not only of the cestui que trust, but also of the trustee, to reclaim possession. Mansfield v. Wardlow, 91 S. W., 859. Also, a defrauded cestui que trust may recover property purchased with his funds, even though the agreement between the trustee and the purchaser was an illegal one and even though the trustee stands in a position where he cannot complain of the transaction. Chaves v. Myer, 13 N. Mex., 368, 85 Pac., 233, 6 L. R. A. (N. S.) 793.

Defendants in error urge also that Peckham's acts were within his authority as Trustee, under his broad grant of powers as such.

■ The sole source of Peckham's powers as Trustee and Scannell's powers as his successor, is the Declaration of Trust above referred to. Defendants in error, while not admitting they owed any duty of making inquiry as to the terms of the Declaration, invoke the broad powers conferred by it upon the trustee, and contend that Peckham as Trustee, in view thereof, had in effect all of the powers of an owner in handling the Trust property. It is recognized generally that those who deal with a trustee, and have notice that he is only a trustee, are bound in law to know he is acting beyond his authority when he handles and uses the trust property as an owner and for his special benefit. Shaw v. Spencer, 100 Mass., 382. Such use is contrary to the principle underlying the existence of trust relationship. Bogert, Trusts and Trustees, Vol. 1, Sec. 1, defines such relationship as "one in which one principal holds a property interest subject to an equitable obligation to keep or use that interest for another." It is estated in Reece v. Medlock, 27 Texas, 120, that "it is a well settled principal that, when an agency is created and conferred by written instrument, the nature and extent of the authority given by it must be ascertained from the instrument itself." While it is true that under the terms of the Declaration the trustee is granted broad powers in respect to the management of the business authorized to be transacted by him as trustee, we cannot agree that he is empowered to handle the property as an owner, or that he was privileged to do with it as he pleased. In Wen Kroy Realty Co. v. Public Natl. Bank, 260 N. Y., 84, 183 N. E. 73, the president of the corporation had unrestricted authority to manage its business and did not by any by-law or

resolution of its Board expressly restrict that broad power. The Court held that the power conferred did not include the power to endorse corporation checks for personal purposes, and that where a bank accepts a check endorsed by the president, it is put upon inquiry to ascertain his actual authority to make the endorsement under the circumstances, saying:

"A power to act for another, however general its terms, or wide its scope, presupposes integrity and faithfulness in its exercise, and cannot be enlarged by implication or construction to the justification of a diversion to the use of the agent of moneys or property subject to the agency."

The stockholders in the present case saw fit to provide two definite limitations upon the powers conferred upon the trustee, one to perpetuate the badge of ownership of the trust property, by providing it be carried in the name of the Trustees as such; and the other, to confine the operations of the business to be carried on to the purposes stated in the Declaration. It is manifest from the terms of the Declaration that Peckham's authority is in effect restricted to exercising the duties of management as was Scannell's after Peckham's death. Neither had any authority with respect to acquiring and holding the trust property, beyond that of managing agent for the stockholders. It is clear from its stipulations that Peckham, as Trustee, did not have all the powers of ownership, and that he had no authority to use the property for his own benefit, either to pay his indebtedness, or in carrying on his personal business.

■ The Trust, through Scannell, was within its rights in repudiating the transactions set out in its cross action and as to which tenders were made. Merriman v. Russell, 39 Texas, 278; Culp v. Robey (Com. App.), 299 S. W., 846; Sherman Case v. Jennings, 17 Texas, 662; Triplett v. Nash Motor Co., 269 S. W., 205. Corpus Juris, Vol. 65, p. 653, under the title, Trusts, states that "It is generally held that a trustee cannot deal with the trust estate to his own advantage, and that contracts made to that end are invalid, although without fraud, and irrespective of whether he intended an actual wrong or whether injury resulted to the beneficiary," citing among other cases, Hendricks v. Wall, 277 S. W., 207 (writ ref.).

It is stated in Michoub et al. v. Girod et al., 4 Howard, 501, 11 L. ed., 1076, that:

"Upon the record and under the law, rather is it not 'the rule of equity in every court of jurisprudence with which we are acquainted, that a purchase by a trustee or agent of the particular property of which he has the sale, or in which he

represents another, whether he has an interest in it or not—per interpositam personam—carried fraud on the face of it,' and that 'the morality and policy of the law as it is administered' always and without 'the inquiry * * * whether there was or was not fraud in fact' positively 'prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another and from purchasing on account of another that which he sells on his own account; in effect he is not allowed to unite the two opposite characters of buyer and seller, because his interest, when he is the seller or buyer on his own account, are directly conflicting, with those of the person on whose account he buys or sells,' and such transaction and in the quoted case 'the purchase is void.' ' ''

The Court further states:

"If the agent is guilty of wrong doing in this respect, the principal, when he acquires knowledge of the facts, may at his election avoid the transaction, or he may compel the agent to account for any excess he received above the real value of the property. This rule applies whether the agent acted fraudulently or not, and although the purchase was fair or at the price set by the principal and therefore no inquiry was in fact suffered by the principal, and even though the price charged by the agent was less than he could have purchased for in the open market."

In the recent case of Buffum, Trustee, v. Peter Bareloux Co., 289 U. S., 227, 53 Sup. Ct., 539, 77 L. Ed., 1140, the Court says:

"This right or opinion of the cestui que trust is one which positively and exclusively belong to him, and it is not in the power of the trustee to deprive him of it by any repurchase of the trust property, although in the latter case the cestui que trust may, if he pleases, avail himself of his own right, and take back and hold the property upon the original trust; but he is not compelled so to do," citing authorities. * * * "Any other rule, it was said, would enable the wrongdoer to take advantage of his own wrong; to let the transaction stand, if the investment showed a profit, and by aid of a repurchase to charge the beneficiary with an intermediate decline. * * * The standard of duty is no different whether the trust to be enforced is actual or constructive. * * * The implications of a trust is the implication of every duty proper to a trust. Equity has its distinctive standards of fidelity and honor, higher at times than the standards of the market place. Meinhard v. Salmon, 249 N. Y., 458, 164 N. E., 454, 62 A. L. R., 1. Whoever is a

fiduciary or in conscience chargeable as a fiduciary is expected to live up to them."

The foregoing cases cited and quoted from amply sustain the action of the Trust in repudiating through Scannell the transactions in question and in asserting the cross action and in impleading Harrell.

The minority opinion of the Court of Civil Appeals correctly holds that there was no ratification on the part of the Trust, and that its cross action was not barred by the statutes of limitation. See 74 S. W. (2d) pp. 679-80, and cases there cited. The correctness of these holdings is more apparent in view of the "corrections and explanations" made by the majority of the Court in its supplemental opinion, based upon undisputed testimony, except in the particular subsequently referred to. A statement of the "corrections and explanations" follows:

"The further statement that Scannell 'had charge of the office' of the Royalty Company in Wichita Falls is withdrawn. It is manifest from other portions of the opinion that Geo. W. Peckham was sole trustee of the company with supreme control of its affairs and the office of the company in Wichita Falls, and also its books and records kept by him in that office. Scannell wes employed by Peckham as secretary and treasurer of the company, and, as testified to by him, he 'kept books, records, and did detail work for the Wichita Royalty Company' under supervision and direction of Peckham. Scannell was not a stockholder during that period, and Peckham's appointment of him as secretary and treasurer was therefore in violation of the provisions of the declaration of trust under which Peckham acted as trustee. And Scannell further testified that all he did was under Peckham's instructions, one of which was that the books and records were to be kept in a safe, and that no one was to be allowed to see them. The statement that Scannell 'also made monthly reports to the 1,300 stockholders' was incorrect, since, according to his uncontroverted testimony, reports to the stockholders were made annually and not monthly, and were prepared by Peckham and mailed out by Scannell under his direction.

"Complaint is made of this further statement in the opinion:

" 'Nor have appellants represented any complaint in behalf of the stockholders that the failure of Scannell to sooner seek recovery of damages claimed in the cross action was prompted by fraud on his part and participated in by the bank.'

"That statement had reference to the cross action filed by

Scannell for and in behalf of the Royalty Company, which, in the opinion of the writer, did not seem to embody any charge of fraud on his own part in his failure sooner to seek a recovery of damages claimed in the cross action. However, counsel for appellants have cited his testimony that, after George W. Peckham's death, he joined with W. H. Peckham, brother of George W. Peckham, and with Harrell's assent thereto, in an agreement to conceal from the stockholders the fraud theretofore practiced by George W. Peckham, to the end that his estate might not suffer from the demands of the stockholders for damages based thereon."

■ The testimony is not undisputed in the particular that there was an "agreement to conceal," which is unimportant in so far as the question of ratification and limitation are concerned. It is undisputed that both Peckham and Scannell concealed the facts from the stockholders, and that the stockholders had no knowledge thereof. The stockholders were without knowledge or notice of any fact that concealment was practiced upon them, and they were under no duty to check the conduct of Peckham, the Bank and Harrell. As expressed by Chief Justice Hickman, (now Commissioner) in reversing and rendering judgment for a principal in Security State Bank v. Burton (Tex. Civ. App.), 10 S. W. (2d) 201, 204, writ of error refused:

"No such duty (to check up the conduct of an agent) rested upon appellant. It had the right to rely implicitly upon the good faith of the agent, and owed no duty whatever to determine whether such agent was truly representing it."

Certainly this is true where, as here, there is no evidence that the cestui had knowledge of any fact calculated to arouse inquiry on their part.

The protection the stockholders had a right to rely upon under the trust plan of operation agreed upon by them, however inadequate it may have been, was that the trustee would carry the property in his name as trustee, and that he would carry on the business of the Trust within the limits prescribed in the Declaration of Trust. The inadequacy of such protection in no way operated to relax or modify the duties imposed by law upon the Bank and its officers in dealing with Peckham.

Discussion of the questions touching the Trust's liability to the Bank on the notes sued upon has been postponed to this point, as the facts relating to the execution and endorsement thereof respectively can now be viewed in a clearer perspective.

■ The endorsement of the $14,596.00 note grew out of the

Marlboro enterprise. Scannell was not authorized to represent and bind the estate in matters arising out of that venture; nor was there any consideration for his endorsement as Trustee. The Trust is therefore not liable, and the trial court should have instructed a verdict as to this note in favor of the Trust.

The $22,000.00 note was a renewal of the $15,000.00 note, dated January 18, 1926, and the $25,000.00 note dated March 1, 1926, less payments. Peckham deposited the proceeds of the loan in the Trust account, but the evidence raises the issues as to whether they were subsequently used respectively for other than Trust purposes. The Trust's liability upon the renewal note depends therefore upon a fact determination of whether the original loans respectively were made for the benefit of Peckham personally.

There has been no audit of Peckham's dealings, individually and as Trustee, with the Bank and Harrell, as reflected by the Trust account, his personal account and the books of the Trust, in the light of the governing principles herein pointed out. While these principles as applied to the facts are determinative as a matter of law of most of the questions presented, their application can be more satisfactorily made through an audit of the books and account referred to, due to the fact that numerous items are involved and a vast amount of checking and cross-checking of items and amounts is necessary in order to arrive at the amount of the liabilities respectively of the Bank and Harrell to the Trust.

It is apparent from what has been stated that the amount of the Bank's liability is the difference between the total amount of the deposits for which Peckham's personal account received credit after he began commingling Trust funds with his own on October 8, 1925, and the total amount of withdrawals therefrom which the Bank may show were used for authorized Trust purposes. It conclusively appears that the Bank is not entitled to credit for expenditures out of the commingled account for the purchase and improvement of Marlboro, or those transactions wherein Peckham acted in the dual role of buying as Trustee from himself personally.

It is necessary that the amount of Harrell's liability be differently ascertained, as he did not become obligated to the Trust as depository for its funds. The Trust's primary contention as set forth in its brief in the Court of Civil Appeals was that Harrell was indebted to the Trust for $15,088.00 as a matter of law, and $84,587.23 as a question of fact. We have

concluded that the Trust's subsequent contention that Harrell's liability arises by virtue of his actionable participation with Peckham in those transactions in which the latter continued to issue his checks upon the commingled account after knowledge of Peckham's infidelity was imputed to him, is correct. In January and March, respectively, 1926, Harrell cashed Peckham's checks aggregating $15,088.00 in payment of a pre-existing indebtedness originating in Peckham's purchase from Harrell and Basham of the Stephens royalty. Such payments were made by means of checks issued by Peckham upon a personal account in which Harrell knew both Trust and personal funds were being deposited. Knowledge was thereby vested upon him of the trust nature of what he received in payment of Peckham's indebtedness. Harrell testified that "it was all alike" to him "whether the Trust account was carried in the name of Wichita Royalty Company or G. W. Peckham," but inquiry pursued with reasonable diligence by Harrell in connection with Peckham's subsequent dealings in which Harrell was also interested, including Marlboro, would have disclosed that Peckham was using Trust funds in purchasing an interest in, and in improving, that Addition. The measure of Harrell's liability to the Trust is therefore determined as a matter of law, on the basis of his actionable participation with Peckham. The contention of defendants in error that the case was tried upon the theory that the Bank became an immediate converter upon the depositing of the Trust funds to Peckham's personal account, if granted, loses its force in view of the necessity for another trial. The amount of Harrell's liability to the Trust is the aggregate amount of trust funds paid out on the transactions in question in which he was personally interested, and which Scannell subsequently repudiated with tenders as pleaded and shown.

■ No basis exists for a judgment in favor of the Bank over against Harrell as prayed, as the Bank through Harrell as vice-president had the same character of notice of Peckham's unauthorized and dishonest dealings as was imputed to Harrell himself.

■ It is obvious that the Trust is entitled to judgment against the administrator of G. W. Peckham's estate as such for the aggregate amount of Trust funds used by Peckham for other than Trust purposes.

■ The remainder of the trial court's judgment being predicated upon its instructed verdict in favor of the Bank, it is

necessary that such remainder be set aside, except that part thereof which discharges from liability Flora A. Kemp and Chas. I. Francis, executors under the will of J. A. Kemp, deceased. These executors were not impleaded by the Trust, which alleged Kemp was guilty of no wrong; but they were impleaded by Harrell and the Bank, who sought judgment over against them in the event of judgment in favor of the Trust in its cross action. We find no evidence of any actions between Peckham, as Trustee, and Kemp, in which Kemp was personally interested; nor have the Bank and Harrell pointed out any testimony calculated to arouse inquiry on Kemp's part as to Peckham's infidelity as Trustee. That part of the judgment directing that the executors of Kemp's will go hence without day should be affirmed, with costs incurred by them.

No demand having been made against either the Bank or Harrell prior to the time of filing the Trust's cross action, interest should be allowed on the respective recoveries from that date.

In view of another trial it is here pointed out that the various sums referred to herein are not stated as finalities but are used for convenience in identifying the transactions to which they relate.

We find it unnecessary, in view of the principles stated, to pass upon any other assignments.

The judgments of the trial court and Court of Civil Appeals on both the direct and cross actions are reversed and the case is remanded for another trial in accordance with instructions given herein, except that part thereof which finds in favor of the executors of Kemp's estate. As to said executors the part of the judgment denying recovery against them on Harrell's and the Bank's plea over, is affirmed, and judgment is here rendered that they recover their costs against the Bank and Harrell.

Opinion adopted by the Supreme Court December 11, 1935.

### ON MOTION FOR REHEARING

It is an open question upon another trial of the case within the principles of law stated in the opinion on original hearing, whether the Bank first acquired knowledge of Peckham's dishonesty on November 17, 1925. This statement is made in view of the Bank's contention in its motion for rehearing with respect to the nature of the items constituting in the aggregate the $5500 transferred by Peckham from the Trust account into his

personal account on October 8, 1935. It is undisputed from the facts disclosed by the present record that such a transfer was made by him, and there is no evidence that a transfer of funds out of the Trust account into his personal account was made at an earlier date. Nor is it contradicted in the evidence that the payment made by him on November 17, 1925, to be credited on his personal indebtedness to the Bank, was made from his personal account which then contained funds transferred thereto from the Trust account on October 8, 1925. It is not intended by anything said in the original opinion to foreclose upon another trial the question of whether the items contended by the Bank to constitute the $5500 were used for authorized Trust purposes; or to foreclose any purely fact finding that may be made from the evidence that may be adduced upon another trial. The suggestion in the original opinion that an audit should be made for use upon another trial, and the statement that the various sums therein referred to were not stated as finalties, were indicative of such intention. The statement perhaps should have included a reference to the various dates as well as sums. It is apparent from the undisputed evidence upon the former trial as to the date when Peckham began his system of transferring funds from the Trust account to his personal account, that the suggested audit should take as its beginning point a date not later than October 8, 1925. The principal aim of the original opinion is to set forth the principles of law applicable upon another trial.

In view of the contention with respect to the character of the items claimed by the Bank to make up the $5500 in question, reference is made to the discussion in the opinion on original hearing of the terms of the declaration of trust, beginning 89 S. W. (2d) 404, at (7, 8) this volume, p. 177, at (5); and also to the principles of law set forth in the excerpt quoted from Steere v. Stockyards National Bank, 113 Texas, 387, 256 S. W., 586, 590, 258 S. W., 1042, cited in the original opinion, supra, p. 172, 89 S. W. (2d) 401.

The motion for rehearing is overruled.

Opinion adopted by the Supreme Court April 8, 1936.