## WICHITA ROYALTY CO. et al. v. CITY NAT. BANK OF WICHITA FALLS et al.

### No. 9107.

Circuit Court of Appeals, Fifth Circuit.

Jan. 30, 1940.

Rehearing Denied Feb. 23, 1940.

Ray Bland and Guy Rogers, both of Wichita Falls, Tex., for appellants.

T. R. Boone and Leslie Humphrey, both of Wichita Falls, Tex., and Tarlton Morrow, of Houston, Tex., for appellees.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The previous chapters in this case are found written in Wichita Royalty Co. v. City National Bank, 5 Cir., 95 F.2d 671; Id., 5 Cir., 97 F.2d 249, and 306 U.S. 103, 59 S.Ct. 420, 83 L.Ed. 515. Pursuant thereto the District Court, after a lengthy oral argument, made findings of fact and conclusions of law, under which it gave judgment in favor of the Bank against Wichita Royalty Company on the note signed by its trustee Scannell, but not on the indorsement of another note; denied recovery to Wichita Royalty Company against the estate of its former trustee G. W. Peckham for his alleged misdeeds, because barred; and allowed recovery to the Royalty Company against City National Bank for $924.71 which Peckham paid the Bank on his own debt out of trust monies on Jan. 19, 1927, and for $178 similarly paid Feb. 15, 1928; but held that these payments were received by the Bank without knowledge that they were misappropriations by the trustee, and that the Bank was not chargeable with other misappropriations by the trustee out of his bank account, if there were any such. The Royalty Company was also denied recovery against Harrell, an officer of the Bank, and against the Bank directors, and other defendants. The Royalty Company and Scannell as trustee appeal, with numerous specifications of error relating to the liability of the Bank and its officers. The judgment that relief against the estate of the former trustee is barred is acquiesced in. A question of the costs of the former appeal is raised.

It will be helpful first to consider the meaning and application of the opinion of the Supreme Court of Texas in this case. 127 Tex. 158, 89 S.W.2d 394, 93 S.W.2d 143. We were affirmed by the Supreme Court of the United States in holding that opinion to be no res judicata, since it merely reversed the case for retrial between the parties then impleaded, and in holding that it is not binding on us as the law of the case after removal to the federal jurisdiction, because we stand in the place of the Texas Supreme Court as the appellate court for the case. It was nevertheless held by the federal Supreme Court that the Texas opinion was binding on it and on us as an exposition of the law of Texas and to be followed, especially on the point that "the bank was responsible for all such misappropriations * * * after it had knowingly accepted trust funds in payment of the trustee's personal debts". [306 U.S. 103, 59 S.Ct. 422, 83 L.Ed. 515.] It would seem that if the federal appellate courts after removal of the case are in the place of the Supreme Court of Texas, that they have the same right and duty to reexamine the statement of the law of the case previously made that the Supreme Court of Texas would have, and that in such reexamination we would not be concluded by the former opinion, but would compare it with what the Texas court had said in other cases in order to determine whether it really expressed the true law of Texas. We would not be free to follow our views of what that law ought to be, but we should seek to find what in fact it was when the instant case arose. Unless the federal appellate courts may do this, the purpose of removal, and indeed of the constitutional grant of jurisdiction to federal courts in some sorts of cases, will be jeopardized. Jurisdiction is granted the federal courts in cases affecting ambassadors and other public ministers, in controversies between two States or a State and citizens of another State, between citizens of different States, and citizens claiming land under grants of different States, and between a State or its citizens and foreign States, citizens and subjects, U.S.C.A.Const. Art. III, Sect. 2, although the cases may involve only the application of State law, because it was thought justice would better be served thereby. Injustice may occur as often, and more subtly, by wrongly stating the law as by wrongly finding the facts. A federal court ought not to be bound by the statement of law made by a State court in the very controversy over which jurisdiction has been vested in the federal courts. The removal of a case for local prejudice may occur at any time before final trial. Can it be supposed that statements of law in the State courts in that very case would bind the federal courts, especially the federal ap-

pellate courts? We believe so to hold would be not merely to belittle unduly the federal courts, but to renounce a part of the substance of their constitutional jurisdiction. The present case, however, is between citizens of the same State, and it was removed only because it arose under the laws of the United States, and we should, as in duty bound, follow the decision of our Supreme Court that it as well as we are constrained to regard the law of Texas to be established by the opinion of the Texas court in this very litigation.

That opinion was expressed on facts as they then appeared. It has no force to establish any fact, and this was stated on the rehearing. It went on the assumed fact that a payment on Nov. 17, 1925, by Peckham to the Bank was known by the Bank to be a misapplication of trust funds. It now appears that there was no misapplication at all in that transaction. Again that opinion said: "Peckham's deed purporting to convey the Marlborough property to the trust was not delivered by Scannell and title to the property was never accepted by the trust." This appears to be a statement of fact rather than of law, but if the latter, it was based on a conception of the facts which is rebutted by evidence now in the record. Because the whole case has been repleaded and the evidence greatly enlarged, and audits of the accounts made since the opinion was delivered, it has little practical application except on the question of holding the Bank for all Peckham's misapplications of trust funds after the Bank participated in one of them.

This very harsh rule, which amounts to making a bank a co-trustee of the commercial deposit accounts of its customers who are trustees, and which is supposed to have been made the law of Texas by the opinion in this case of the Supreme Court of that State, comes into play only when the bank *knowingly and consciously* participates in a misappropriation by the trustee. It is not enough that the bank unwittingly, though it might have known the truth by auditing the accounts of its customers, receives trust money from the trustee on his personal debt. That this is the meaning put upon the opinion by the Texas court is plain from the first sentence of its opinion on rehearing and from its description of the case when it was reviewed in Quanah A. & P. R. Co. v.

Wichita State Bank & Trust Co., Tex. Sup., 93 S.W.2d 701, 709, as "an action where it was charged that the bank actively participated in the spoilation of the trust fund and knowingly received a part of the fund to itself in payment of the trustee's individual debt to it." So also the Supreme Court of the United States says: "The state court had ruled that the bank was responsible for all such misappropriations as took place after it had *knowingly* accepted trust funds in payment of the trustee's personal debts"; and in another place recites the very words which we quoted just above. "Spoliation" is a word of evil connotations, and the dictionaries make it synonymous with pillaging, plundering, and robbing. "Knowingly" plainly speaks its own meaning. Now the auditing in this case shows that the transaction which the Supreme Court of Texas thought was spoliation was not such and that in it Peckham took from the trust only what was due him. The District Court has found that in no other instance did the Bank knowingly receive trust funds from Peckham in payments to it, or join him in spoliation of the trust. It found indeed that all Peckham's actions were honest as between him and the trust. This finding is assailed here, but we need not review it, because Peckham's liability is out of the case, and because his honesty is not controlling, since it is also found that the Bank did not know of his dishonesty, if any. We find no evidence which requires a finding that the Bank did know in any instance.

This finding of its innocency shields the Bank from liability for Peckham's breaches of trust where the Bank was not the beneficiary. There were apparently such breaches, as where he as trustee bought property from himself, sometimes making a profit. The trust could at its option repudiate such transactions, and could hold Peckham for withheld profits in trust transactions, but the Bank was not involved thereby. It could not object, instead of the beneficiaries, to such trades if it knew of them, for they were not void, and could be affirmed by the trust, and many were affirmed by the successor trustee Scannell.

There remain transactions in which the Bank was the beneficiary, in receiving payments on debts due to it by Peckham individually. In them a wholly different principle governs. The trust is

tracing its funds into Peckham's individual bank account and thence into the Bank's hands. Since the payments were on existing debts and on no new consideration, the Bank cannot claim the status of a purchaser for value, no matter how innocent it may have been; and is subject to the doctrine of notice, whereby it is charged with knowledge of what it might reasonably have found out. Since it was not a bona fide purchaser, on proof that it got the trust's money equity will require it to restore the money. The District Court required two such restorations. It found the tracing insufficient as to the others claimed. There were several transfers of funds from the trust account to Peckham's individual account followed by payments by him to the Bank. But Peckham habitually advanced his own funds for trust purchases, afterwards reimbursing himself from the trust account, and sold property to the trust, paying himself out of the trust's money. It is often hard to tell whether a transfer of money from the trust account to his own was or was not a breach of trust, Peckham being dead. He no doubt would have had the burden of proof in an accounting with him; but when it is sought to hold the Bank as having received trust funds the burden is on the trust to show that the money the Bank received belonged to the trust and not to Peckham. We find no instance except those allowed by the District Court where liability is clearly enough shown to overthrow the findings below.

■ Transfers from the trust account to Peckham's account were usually made by the Royalty Company's check payable to the Bank, presented by Peckham with an instruction to credit to his account, instead of by a check payable to Peckham and indorsed by him. This puzzled us on the former appeal. It now appears that it was a practice begun with another bank and by the trustee who preceded Peckham and continued by Scannell who was bookkeeper the whole time and drew the checks. Its purpose is not explained by this record, but the practice was well understood by the Bank. The checks were charged to Peckham on the Royalty Company's books. While not regular commercial transactions, we think they authorized the Bank to pay from one account to the other, and charged it with no special duty to enquire why the payment was ordered. Nearly all these checks were signed by Scannell, who had authority to sign checks for the Royalty Company.

We have hesitated much concerning certain checks, claimed to amount to about $11,174, which were issued payable to the Bank to be applied on notes owed the Bank by the Royalty Company, and so vouchered and entered on the Royalty Company's books, but which Peckham deposited to his own account. During the period covered by them Peckham paid to the Bank out of his account on the Royalty Company's notes $7,244. The difference, some $2,900, was promptly claimed against Peckham's estate by Scannell when he became trustee and was reconciling his books with the Bank's. Whether Peckham's intentions were honest or not, this sum was plainly misappropriated. If the checks had simply been sent to the Bank, it ought to have applied them to what the Royalty Company owed it, or else obtained special instructions from it. But when Peckham presented them for deposit to his credit, apparently in accordance with the longstanding custom, because the vouchers showing they were issued not to him but for payment to the Bank were detached and retained by the Royalty Company and were unknown to the Bank, and seeing that Peckham was himself the only person who could speak with authority for the Royalty Company, the Bank failed in no duty in giving him credit for these, as it had always done for checks so drawn and intended for him. It did not thereby become liable as for knowingly assisting in a misappropriation. It does not appear that it got any of this money on any personal debt of Peckham, to restore which it might have been held on a tracing of the funds.

We have reserved for special separate discussion the Marlborough Addition, a residential subdivision project in which Peckham and his brother and an officer in the Bank Harrell, and another officer Kemp, were equal owners since September, 1925. There were notes in large amounts given for deferred payments of purchase money, and large expenditures for improvements. Peckham, Harrell, Scannell and others bought lots, and the enterprise was considered a good one at the death of Peckham in 1929. Peckham acquired his brother's one-fourth interest and, unknown to the other owners, in April, 1926, executed a deed to his one-half interest to Wichita Royalty Company and handed it to Scannell, who was serving as Secretary and Treasurer and had custody of all its books and papers, along with a letter ad-

dressed to the Royalty Company. The letter certified that the Royalty Company was the owner of a half-interest in the 252 lots of Marlborough Addition subject to one-half of outstanding notes amounting to $50,000, but it would be held in Peckham's name because the other owners would not care to be associated with a stock company, but that a deed was enclosed "which you can file for record if it becomes necessary." This property and its incumbrances were entered on the records of the Royalty Company, as also the later contributions by the Royalty Company to further development, but there is no affirmative proof that the certificateholders were advised of it. When Peckham died in 1929, and Scannell was appointed trustee, with full knowledge of all the facts he notified Harrell that the Royalty Company owned the half-interest, and he continued to pay out money for the Royalty Company to carry the enterprise forward. He assisted in the organization of Texas Investment Company to take over the Addition and became its President. He opened up its books, accepted as trustee its stock for the Royalty Company's one-half interest, and voted it. He signed as trustee for the Royalty Company the note the Bank has recovered judgment on, in renewal of others which Peckham had given as trustee, knowing it represented in part indebtedness incurred because of Marlborough Addition. This was done notwithstanding a full audit of the trust had been made by Scannell, and he as trustee had disaffirmed some of the transfers of property from Peckham to the trust. The stock market crash in November, 1929, had adversely affected the Addition, but it still seemed valuable, whereas Peckham was dead and his estate probably insolvent. Scannell did not attempt to repudiate Marlborough Addition and its debts for the Royalty Company when he made claim against Peckham's estate, nor for more than a year after he became trustee.

■ The Supreme Court of Texas thought the deed from Peckham to the Royalty Company had not been delivered or accepted, Scannell having so testified and the letter which accompanied it not having then come to light. The letter makes plain that the deed was delivered to Scannell for the Royalty Company, but was to be withheld from record to avoid dissatisfying the other owners. Peckham as an individual parted with its custody to the proper

custodian of the Royalty Company's papers with intent that it should pass title, and this Scannell well understood because he caused the books thus to show. But the Texas court also thought, and we agree, that the trust related only to oil and gas properties, and Peckham as trustee had no right to invest in a city addition. We have also held that Scannell as trustee had no greater right by way of ratification; but we suggested that as sole manager of the trust he might have power to elect to adopt rather than repudiate the unauthorized investment as a means of saving the trust from loss. The District Court has held Scannell could do and did that. We think he could. While as an original investment Peckham could not make or Scannell ratify it, after the trust's money in a large amount had been used to pay for and improve this property, and Peckham had died insolvent, the question of what the trust should best do to save itself was a question of management which the new trustee under the declaration of trust had full and sole power to decide. He could validly determine to elect to go ahead with the matter rather than to repudiate it and undertake doubtful litigation to recover what money he could for the trust. Having with full knowledge thus elected, the trust would be bound just as though the certificateholders had specially authorized it. It is earnestly argued that there is no evidence that Scannell did so elect. He does not testify expressly that he acted as he did to save a loss, but he does not deny it. He admits all that was done by him, and the circumstances may be looked to for his motives. They consist with the purpose to elect for the good of the trust. We cannot say the evidence does not support that conclusion.

■ It follows that the trust cannot now complain at the borrowings and the payments that were made on this account by Peckham as trustee, for that would be inconsistent with the election to keep the property. The attack on the $25,000 note of March 1, 1926, which was in part renewed into the note sued on thus fails, for what Peckham and his associates got of the proceeds as purchase money for Marlborough Addition they were entitled to.

■ The note of $15,000 of Jan. 18, 1926, also in part renewed into the note sued on, was used in part to pay for the Stephens Royalty, a half interest in which Peckham acquired for himself and sold to the trust at a profit. The Bank, through

Harrell, knew of this profit. As we have before said, this sale to Wichita Royalty Company was not void but only voidable. It was an investment of a kind the trust could make. If it was worth more than Peckham had originally paid, that would not absolutely prevent a sale at the then value. It in fact was a satisfactory investment. Scannell as trustee elected to keep it, and later sold it. If Peckham ought not to have charged the profit, he ought to return it; but the Bank ought not because of it to lose what it loaned the Royalty Company to buy the property. ·

We agree, therefore, with the District Court that no reason appears why the Bank should not recover on the note which it now sues.

As to the costs of the former appeal, our judgment, which was affirmed in the Supreme Court, expressly denied costs. The Supreme Court denied a special motion to allow costs, "without prejudice to an application to the proper court at the proper time." It is argued that the effect of this was to treat the former appeal as suspended in order that findings of fact and conclusions of law might be made, so that this appeal is but a continuation of that. If that be so, since appellants now lose this appeal they have no ground to claim an allowance of any costs of appeal.

Judgment affirmed.