## QUANAH, A. & P. RY. CO. v. WICHITA STATE BANK & TRUST CO.
### No. 6744.

Supreme Court of Texas.
Dec. 11, 1935.

G. E. Hamilton, of Matador, C. Y. Welch, of Quanah, and Allen & Gambill, of Fort Worth, for plaintiff in error.

M. M. Hankins, of Quanah, and Bullington, Humphrey & King, of Wichita Falls, for defendant in error.

Guy Rogers, of Wichita Falls, amicus curiæ.

GERMAN, Commissioner.

The Quanah, Acme & Pacific Railway Company, herein called plaintiff, brought this suit against Wichita State Bank & Trust Company, herein called defendant, and another, with whom we are no longer concerned. The plaintiff sought to recover of the bank a large sum of money on the theory of conversion, or upon the theory that it had aided and assisted one T. K. Hawkins in a misappropriation of said money, by crediting to the personal account of said Hawkins checks belonging to plaintiff, under circumstances which charged defendant with notice that Hawkins had misappropriated said funds. A general demurrer to the petition was sustained, and the action of the trial court in doing so was affirmed by the Court of Civil Appeals. 61 S.W.(2d) 170, 171. The effect of this holding was that plaintiff failed, as a matter of law, to plead a cause of action.

The statement of the essential portions of plaintiff's petition given by the Court of Civil Appeals is so very succinct and accurate, and yet so entirely sufficient to present the dominant question for decision, we are constrained to set it out in full:

"Appellant is a railroad corporation, operating out of the city of Quanah, and has been since about the year 1909. From 1909 until about September, 1931, it had in its employment one T. K. Hawkins as its treasurer and auditor 'whose duty was to collect and deposit all moneys and revenues

arising from such business to plaintiff's credit in its depository bank at Quanah, which for many years had been and was still such depository on the last mentioned date, to-wit: the Security National Bank of Quanah.' It was alleged, in substance: That much of the outbound freight moved on other roads and that the delivering carrier collected the revenues and distributed same among the carriers participating in the haul in accordance with the proportion earned by each. That the said T. K. Hawkins would draw a draft against the collecting carriers for the proportional amount of freight coming to appellant and deposit same in the said Security National Bank of Quanah. That about March, 1925, 'the said T. K. Hawkins began the practice of withholding from deposit one or more of the drafts above described, for which he would request the Security National Bank to issue to him bills of exchange payable to him as treasurer * * * for varying amounts * * * and at his request said depository bank issued to said T. K. Hawkins many bills of exchange drawn against other banks * * * and which practice occurred practically every month from March, 1925, to August, 1931. That up to about the month of April, 1931, such bills of exchange were payable to T. K. Hawkins, Treas. * * * But after said date said bills of exchange were made payable to T. K. Hawkins, Treas., Q. A. & P. Ry. Co.' That an example of the wording of one of such bills of exchange is the following:

" 'The Security National Bank of Quanah, Texas,

" 'Quanah, Texas, Jan. 31, 1930.
" 'Pay to the order of T. K. Hawkins, Treas. $417.65. Exactly Four Hundred Seventeen Dollars 65 cents. Exactly.
" 'To The Continental National Bank, Ft. Worth, Texas.
" 'H. M. Bumpass, Cashier.'

"It is further averred that such bills of exchange were indorsed 'T. K. Hawkins, Treas.'; that all of these bills of exchange were paid for by drafts drawn by T. K. Hawkins for freight as aforesaid and were each and all the property of appellant; that T. K. Hawkins embezzled, with the aid of appellee, Wichita Bank & Trust Company, the proceeds of bills of exchange between March, 1925, to September, 1931, in amounts which aggregated the sum of $63,054.65; that the scheme used by Hawkins was to indorse and deliver such bills of exchange to appellee, some of them personally and some of them by mail, each of them to be credited and were credited to his personal account and that all of the funds so deposited were withdrawn on the individual check of Hawkins; that the bank knew, by virtue of the form and contents of said bills of exchange and that T. K. Hawkins had indorsed same, that such bills of exchange were the property of appellant; that Hawkins was at the beginning of said transactions a stranger to the officers and employees of same and remained a comparative stranger to appellee throughout the period of time already mentioned; that during all of such time appellee knew that there were adequate banking facilities at Quanah and that Quanah was situated approximately eighty miles from Wichita Falls, which was the banking home of appellee; and that appellee at no time made any inquiry as to the cause or occasion of said unusual deposit or the use of the bills of exchange by the said Hawkins 'but received and accepted same and received the proceeds thereof from the drawee banks in each instance with but the slightest investigation.' The petition further avers a lack of authority and right in Hawkins to convert to his own use the said bills of exchange or to indorse or negotiate same for his own personal use and benefit; that he was attempting in so doing to act both for himself and for said corporation; that by reason of these facts and circumstances, the said bank was charged with 'actual knowledge that said Hawkins was so misappropriating and converting, with the aid and assistance of said defendant Bank, the funds, moneys and credit of plaintiff and by proper inquiry the said Bank could and would have prevented loss to itself and to this plaintiff.'

"This petition, in fact, specifically alleges knowledge on the part of appellee of said misappropriations and embezzlements but it seems to have been agreed in the trial court and acquiesced in by all parties in oral argument before this court, that it had only such knowledge as might be visited upon it by all the facts and circumstances connected with and surrounding the transactions leading to the acquisition of the funds aforesaid."

▇ The Court of Civil Appeals correctly held that the fact that the cashier's checks on their face showed they were payable to Hawkins as treasurer and as treasurer of the Quanah, Acme & Pacific Railway Company was sufficient to give notice to the

bank that they were checks belonging to the railway company, and were not the property of Hawkins personally. We think this is so well settled as not to require discussion.

In view of the action of the trial court in sustaining a general demurrer to plaintiff's petition, the question for decision is succinctly this: Can it be said as a matter of law that the bank was not put upon inquiry by all the facts and circumstances of the situation as alleged to ascertain whether or not Hawkins had authority to deposit the funds of the railway company to his personal account and check same out upon his personal checks, regardless of the purpose for which said personal checks were given?

. Conversely, the dominant legal proposition involved may thus be stated: Was the act of the defendant bank in placing to the credit of Hawkins personally checks which it knew belonged to the railway company and not to Hawkins, and in thus enabling Hawkins to later check out the funds in payment of his personal obligations, such an act of conversion on the part of the bank, or such participation in the wrongdoing of Hawkins, as made the defendant liable to the railway company for the funds so misappropriated?

As we have reached the conclusion that this case, involving as it does the acts of an officer of a corporation in depositing to his personal credit the funds of the corporation, is to be considered in a class different from cases where a trustee or other fiduciary deposits funds held by him in trust to his personal account, we do not find it necessary to determine whether or not the precise question involved has already been decided by this court in the case of United States Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Tex. 379, 137 S.W. 648, 653, 138 S.W. 383, 384, 37 L.R.A.(N.S.) 409, Ann. Cas. 1914B, 667. Nor do we find it necessary to choose between the conflicting decisions of able courts upon the much-discussed question of a bank's liability for deposits made by fiduciaries. We do say, however, that we have carefully considered practically all of the American decisions touching the question of liability of a bank for deposits by fiduciaries, and the decision expressed herein has been reached after the most mature and exhaustive consideration of all phases of the problem.

In this instance, Hawkins, while occupying a fiduciary situation, was the treasurer of a railway company incorporated under the laws of this state. Such a corporation must necessarily act through officers and agents with delegated powers and authority. Under section 42 of article 5934 of Revised Statutes of 1925, the checks in this instance were deemed prima facie payable to the railway company. While it is true that by said section Hawkins as treasurer was authorized to indorse the checks for negotiation, and while he also had general authority to indorse checks, yet every person dealing with him was charged with knowledge that he was not authorized to indorse said checks for the purpose of transferring the funds to himself individually. It is strikingly unusual for an officer of a corporation to indorse checks payable to the corporation, or payable to himself as treasurer of the corporation, and open a personal account in his own name for the purpose of using the account in furtherance of the legitimate purposes of the company. The question, therefore, may not be, properly speaking, a total lack of authority on the part of an agent or officer to indorse checks of the corporation in order to transfer funds to himself personally, as the language of some of the decisions at first sight seems to imply, but this case may be disposed of upon the proposition that the exercise of authority (even if it existed) was such an unusual act as to arouse suspicion and incite inquiry. It seems to be definitely settled, even in states, like New York, for instance, which strongly defend the nonliability of banks in cases where ordinary fiduciaries deposit trust funds to their personal accounts, that a "bank must ascertain at its peril whether the president, district manager, secretary, treasurer or any other officer or agent of a corporation has authority to endorse a check drawn to the order of the corporation and by such endorsement transfer the money to his personal account." Michie on Banks and Banking, vol. 5, p. 164.

In the case of Wagner Trading Co. v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347, 348, 9 A.L.R. 340, by the New York Court of Appeals, which is the same court that wrote the case of Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A. 1916F, 1059, strongly relied upon by the Court of Civil Appeals, the president of a corporation indorsed checks payable to it and deposited same to his personal account, the funds being later paid out on his personal checks, the court said: "The facts showing the conversion are complete. Wagner had authority to indorse the checks, although no by-law or resolution is

in evidence to that effect, but only for the purposes of the corporation's business, and not to transfer the checks to himself personally or for his personal use. The defendant endeavored to prove estoppel and negligence of the plaintiff. The trial court rightly excluded all such evidence. The plaintiff had no relations with and owed no special duty to the defendant. It was not a depositor of the defendant. When the defendant accepted the deposit of Wagner and became his banking agent, the defendant was in complete control of its relations with Wagner. It could, to safely protect itself in its dealing with Wagner, inquire as to his relations with the plaintiff, the authority he possessed, and could insist upon an examination of the plaintiff's by-laws and minutes if it thought that necessary to protect itself. When it accepted the checks payable to the plaintiff and indorsed by Wagner as president of the plaintiff for deposit to the account of Wagner himself, it did so at its peril *to ascertain* whether Wagner had authority to indorse them and *by his indorsement transfer the money to be paid thereon to his personal account.* Cheever v. Pittsburgh, S. & L. E. R. Co., 150 N.Y. 59, 44 N.E. 701, 34 L.R.A. 69, 55 Am.St.Rep. 646; Ward v. City Trust Co., 192 N.Y. 61, 71, 84 N.E. 585. If Wagner had no such authority, title to the money in question never passed to the defendant, and, if it received it, it did so without authority, and must account and make payment to the owner." (Italics ours.)

In a latter portion of the opinion, the court clearly indicates that the decision is not predicated entirely upon the question of lack of authority, but upon the fact of the exercise of authority in the accomplishment of a purpose of such nature as to incite inquiry and suggest warning. In this connection, the court said: "Assuming, as we do, that Wagner had general authority to indorse checks for the plaintiff's corporate purposes, this clearly does not authorize him to indorse checks to his own order and appropriate the money to his own personal use, and *the nature of this transaction was such as to warn defendant that the checks were being diverted from usual business channels.*" (Italics ours.)

The rule of decision announced in this case has later been reaffirmed in the case of Dwelle-Kaiser Co. v. Harrison Engineering & Construction Corporation, 143 Misc. 899, 258 N.Y.S. 704, and in the case of Wen Kroy Realty Co. v. Public National Bank & Trust Co., 260 N.Y. 84, 183 N.E. 73, 74, which is perhaps the last expression of the Court of Appeals of New York upon the subject.

In the case of Lasker v. Mutual Bank of Roseville, 201 App.Div. 333, 194 N.Y.S. 381, 382, the court interpreted the decision in the case and showed the real basis of same in this language:

"The court said that Wagner had authority to indorse the checks, but only for the purpose of the corporation's business, and not to transfer the checks personally or for his personal use, and continued:

" 'When it [defendant] accepted the checks payable to the plaintiff and indorsed by Wagner as president of the plaintiff for deposit to the account of Wagner himself, it did so at its peril to ascertain whether Wagner had authority to indorse them and by his indorsement to transfer the money to be paid thereon to his personal account.'

"The bank had notice that Wagner was appropriating a check, payable to the corporation, to his own use, and a reasonably prudent person would have inquired as to his authority."

In the case of American Lumber Sales Co. v. Fidelity Trust Co., 127 Me. 65, 141 A. 102, 106, by the Supreme Judicial Court of Maine, the principle here involved was clearly recognized; the court citing with approval the language above quoted in the Wagner Case. In addition, the court used language which we think is appropriate upon the question of notice in the present case. In that case the court said: "If authority be necessary, the foregoing seem to abundantly justify the conclusion that in the case at bar the defendant should reimburse the plaintiff for its losses through the bank's acceptance of its checks for deposit on Schoeppe's personal account. The transaction was irregular on its face. Already two company accounts were running with the bank, one unknown to and unauthorized by the company but of record in the bank. For Schoeppe to offer for deposit in his personal account paper on its face payable to the company, when there were in that institution company accounts regularly receiving its deposits, was so contrary to the usual course of business that we think it should have put the bank on sharp inquiry."

In the case of Singer Sewing Machine Co. v. Citizens' National Bank & Trust Co., 111 N.J. Law, 199, 168 A. 32, by the Supreme Court of New Jersey, it is held that a bank

which credited checks payable to a corporation to the personal account of its manager, without making inquiry as to the manager's authority to not only indorse the check but to take credit to his personal account, was liable to the corporation. Various authorities, including the Wagner Case, are cited in support of the holding.

In a number of respects the case of Buena Vista Oil Co. v. Park Bank of Los Angeles, 39 Cal.App. 710, 180 P. 12, 14, is similar to the present one. In that case the check of the corporation had been indorsed by a secretary and the money placed to his personal account. While it is true the secretary had no authority to indorse checks of the company, and in the present case the treasurer did have such general authority, yet it is likewise true that in the present case Hawkins did not have either express or implied authority to open a bank account in his own name with the railway company funds, and when he attempted to do so the defendant was put upon inquiry, notwithstanding the general authority to indorse checks. In the case above mentioned, the court, in stating the question for decision, said: "May a bank, without previous dealings with a corporation, and unacquainted with its officers or their powers, accept a check, by its terms payable to the order of such corporation, bearing the indorsement only of the payee's name by its secretary, collect the amount of such check, place it to the credit of the person presenting it, refrain from making any inquiries as to the authority of such person, permit him to withdraw such proceeds, and escape liability to the payee, in the face of the uncontradicted evidence that such person as secretary had no authority to act, and that the moneys so withdrawn were devoted to his personal use?"

Giving a' negative answer to the inquiry, the court used language which we think appropriate here, particularly when we recall that in this instance the bank was not required to handle these checks, was acting with an entire stranger, paid nothing of value for the checks, and did everything it did solely because of a "desire for patronage." In that case the court said: "It would appear that any prudent and intelligent person would have been placed on notice by the very presentation of the check in controversy for deposit, as it possessed within itself, as we view it, elements of suspicion and irregularity. Being chargeable with knowledge that the power of such sec-

retary will not be presumed, but must be shown, it was the duty of the bank, before dealing with such check, to establish the evidence of the secretary's power. Defendant contends that it would place a burden upon bank tellers 'if they were compelled to exercise judicial functions and ascertain the ownership of funds represented by thousands of checks which were deposited under similar circumstances, before placing the same to the credit of the last indorser. Further, how much patronage would a bank have if it were to challenge the honesty of the man making the deposit?' To our mind it is not a question of the bank's challenging the honesty of any one, but the performance of a duty impressed upon it by law. 'Desire for "patronage," while commendable, should not be encouraged by the practice of unbusinesslike and irregular transactions'—as respondent so well puts it. From the evidence here it appears that defendant, without making any inquiry whatever—and Kemper was careful not to offer any information—accepted the check for collection, forwarded it to the drawee bank for payment, received the amount, and still, without making any effort to comply with its duty of inquiry, and upon Kemper's instruction, placed the amount to the credit of Kemper, as secretary, and thereafter permitted him to make withdrawals therefrom. The very name of the payee, and the attempted indorsement, cast a 'shadow' upon the check, which could have been removed by the performance by the bank of its plain duty under the law—that of inquiry."

It is obvious that Hawkins as treasurer of the railway company could not be presumed to have actual authority to transfer company funds to himself and to open an account' in his own name with such funds at a bank in another city from where the depository bank was located. Of course, the question of apparent authority is not in the case, because the defendant had no knowledge of prior dealings with Hawkins such as are involved here. We therefore think that the language of the court in the case of Knoxville Water Co. v. East Tennessee National Bank, 123 Tenn. 364, 131 S.W. 447, 449, is pertinent upon the question of the duty of the bank to institute inquiry as to the right of Hawkins to appropriate the funds in question by placing same to his personal account. In that case the court said: "On the question of apparent authority, however, we wish to say that

these deposits by Martin seem to us irregular and unusual, and they should have aroused the suspicion of the bank when made. For an employee to bring his employer's bills receivable to a bank with which the latter has no business relations, for the employee there to indorse them in his employer's name, and for the employee to ask that such bills or checks be placed to his individual credit—such transactions seem to us to be so out of line with, and contrary to, the usual course of business, that they should have served to put the bank on sharp inquiry. We think this is true, whether the employee so offering such checks be president, manager, treasurer, or any other officer or agent of an employing corporation. And we think a bank, which under these circumstances accepts such a deposit to the individual credit of an employee, subject to his individual check and disposition in this way, has little ground upon which to urge that such an employee was thus acting within the apparent scope of his authority."

, In a recent English case, Underwood, Ltd., v. Bank of Liverpool, 1 K.B. 775 (1924) a corporation officer tendered for deposit in his personal account checks which were on their face property of the corporation indorsed by him officially. Without investigation the bank received the checks, gave the officer personal credit for them, and permitted him to dissipate the funds by his personal checks. The bank was held liable. The opinion contains much that is pertinent to the present case, but we select only that part dealing with the question of apparent authority. In the present case, the action of the bank cannot possibly be sustained upon any theory other than the theory of the apparent authority of Hawkins to do what he did. In the English case mentioned, the court, among other things, said: "In the present case. A. L. Underwood in asking the bank to collect and pay the proceeds into his private account was not purporting in this transaction to act as agent for his company, or to create privity between them and the bank, he was acting and purporting to act for himself as principal. Just as you cannot ratify the act of an agent who did not profess to act for you. * * * So in my view you cannot rely on the apparent authority of an agent who did not profess in dealing with you to act as agent."

Just here we find an answer to the argument which is frequently made to the effect that if a bank may pay money over the counter to a fiduciary on his indorsement of the check without liability, there is no logical reason why the bank may not also credit to the personal account of the fiduciary the proceeds of checks which he has indorsed. The simple answer is that when an officer of a corporation at the bank window indorses a check payable to the corporation or payable to him in his official capacity, and receives the money, he does so in his official capacity; but when he indorses the check and requests it to be credited to his personal account, he immediately lays aside his official garment and ceases (in the matter of receiving the credit) to act officially, but acts personally. In other words, in the matter of taking credit for the money he acts and purports to act for himself as principal, and not as an official of the corporation.

In the case of Toronto Club v. Dominion Bank, 25 Ont.L. Reports, 330, it was very aptly said: "It is one thing to cash a cheque over the counter to an official who has power to indorse and to receive the proceeds for his employer, and quite another to receive it and apply it not for the employer's but for the official's use. There might reasonably, in the former case, be a presumption that the official will deal honestly with the proceeds, but in the latter, where he in effect puts the money into his own pocket, the presumption would be all the other way."

In the case of Broadway Boxing Club v. Bushwick National Bank, 127 Misc. 515, 216 N.Y.S. 713, 714, the court said: "Plaintiff also asserts that the bank was negligent as a matter of law in paying out checks drawn to the order of cash and signed by the plaintiff corporation, per Ehrlich as treasurer, when such checks were presented by Ehrlich in person. The defendant was not negligent as a matter of law in so doing. Whether it was negligent or not was at best a question of fact for the jury, and the jury have held that the bank was not negligent. The bank could only be held to be negligent in the event that it was put on notice or inquiry that the proceeds of the check were being or to be made the subject of a larceny or conversion. Such notice or being put upon inquiry arises when a check is made payable to the officer, and signed by the corporation per that selfsame officer, or where, no matter how the check is made payable, the bank is apprised that the proceeds are being applied to the

officer's personal affairs, *as when a check payable to cash is placed by the bank to the personal credit of the officer in an account the bank may have for that individual.* But when a check, made payable to cash, is presented by an employee or officer of a corporation, authorized to sign for such a corporation, to a bank for payment in cash, the bank has no means of knowing from a mere inspection of the check that the proceeds are going to be subjected to larceny or conversion by the one presenting the check. It is only put on notice where the individual presenting it is the payee or is *depositing such a check in his private account.*" (Italics ours.)

The rule here applied was, we think, clearly recognized by Judge Holmes in the case of Empire Trust Co. v. Cahan, 274 U. S. 473, 47 S.Ct. 661, 662, 71 L.Ed. 1158, 57 A.L.R. 921, strongly relied upon by defendant. In that case he said: "In the case of checks drawn by a corporation not likely to disburse except for corporate purposes there might be stronger reasons for requiring a bank to be on its guard if an ·officer having power to draw them deposited checks for considerable sums to his private account." ·

 The decisions are practically in accord, in all cases involving deposits by fiduciaries, in holding that a bank receiving a check and placing it to the personal account of the fiduciary is liable if there are surrounding facts and circumstances of which the bank has knowledge indicating that the transaction involves a conversion and which are sufficient to charge it with the duty ·of inquiry, and we so hold. In addition to the nature of the transaction herè involved, there are circumstances which are potent as tending to incite suspicion. Some of them have already been noted. The bank knew by the face of the checks that Hawkins was treasurer of the railway company. By article 6275 of the Revised Statutes of 1925, the company was required to keep its general offices at thè place named in its charter. This is alleged to be Quanah, in. Hardeman county. The defendant knew that there were ample banking facilities there, and should have reasonably anticipated that the railway company kept its depository at the place where its general offices were located. Funds of railway companies are generally received from many different sources. In this instance the checks presented were all cashier checks, payable to Hawkins as

treasurer, issued by the depository bank of Quanah. The checks being payable to Hawkins as treasurer, and the fact that he presented them to the bank, were circumstances sufficient to inform the bank that he had, for some reason, taken funds of the railway company and changed them into the form of cashier's checks. This was rather an unusual proceeding. In doing this, he was in effect dealing with himself. It is the universal rule that the act of an officer of a corporation dealing with himself is regarded with suspicion. During ' the year 1925 there were .5 checks deposited. . During the year 1926 there were 11 checks, coming at frequent intervals. During the year 1928 there were 8 checks. During the ' year 1929 there were 12 checks. During 1930 there were 12 checks, and during 1931 there were 8 checks. There were a total of 56 checks aggregating $63,054.65. According to the allegations, the defendant bank was located at Wichita Falls, a distance of 80 miles from the general offices of the railway company, and Hawkins at the time of thè opening of the account was a· stranger to the bank.

The case of Niagara Woolen Co. v. Pacific Bank, 141 App.Div. 265, 126 N.Y.S. 890, 893, involved an action against a bank which had credited to the personal account of the president of the corporation checks belonging to the corporation, and upon the question of notice the court made the following comment: "This was not the case of one independent check, but a series of transactions extending over months, dur-' ing which time there was a constant diversion of checks drawn to the order of the plaintiff, deposited with the defendant, collected by it, and then applied by it to the individual account of Horowitz or his firm. By the act of Horowitz in depositing these checks and of the defendant in accepting and collecting them, it became liable to Horowitz's firm and recognized its liability by paying out to the order of Horowitz's' firm checks drawn on it by that firm. Was this notice to the bank that Horowitz was misapplying or using for his own purposes the checks drawn to the order of the plaintiff and which upon their face appeared to be the plaintiff's property?"

Answering this inquiry the court said: "I think, therefore, that the facts as found by the referee, and which are sustained by the evidence, were sufficient to require the defendant to inquire as to Horowitz's authority to appropriate the property of the

corporation of which he was president; that, having failed to make such inquiry, it is chargeable with the facts which it would have ascertained if such an inquiry had been made; and that, if it had had express knowledge of the facts which such an inquiry would have disclosed, it would have been liable to the plaintiff for the misappropriation of its property by Horowitz."

In the case of Toronto Club v. Dominion Bank, supra, it was stated that, "while one or more of the checks might have passed without impunity, it seems quite impossible so to regard the large and almost continuous stream of them received in a short space of time, without inquiry of the secretary himself, so far as it appears, as to how he claimed to have become entitled to deal with them as his own;" and the court gave great weight to this circumstance in holding the bank liable.

In the case of Mee v. Carlson, 22 S.D. 365, 117 N.W. 1033, 1034, 29 L.R.A.(N.S.) 351, the question of notice to the purchaser of a note was involved, and in commenting upon the probative force of certain circumstances, the court said: "The fact that Lefebure indorsed the note 'without recourse' was a circumstance calculated to arouse suspicion in the mind of a prudent person, and the further facts disclosed by the evidence that Lefebure resided out of the state, that there were a number of banks in his vicinity, and in the vicinity of the defendants, and that he was comparatively a stranger in Centerville, were calculated to create doubts in the minds of ordinarily prudent persons as to the validity of this note."

We, therefore, conclude that instead of the facts and circumstances in this case showing as a matter of law that the defendant bank was not put upon inquiry to ascertain the right and authority of Hawkins to deposit the checks to his personal account and check them out in payment of his own obligations, they unquestionably placed upon the bank the duty of inquiry. In making this holding, we believe we are not placing any undue burden upon the banks of the country or upon legitimate banking transactions. This is not a case involving the acquisition of negotiable paper in due course. The effect of such decision is not to place on the bank the duty or responsibility of supervising or inquiring into the acts of a fiduciary in the handling of a trust account already established. It involves the voluntary opening of a new account in the name of an individual stranger with funds known to belong to a railway corporation. In support of the doctrine of liability on the part of a bank for the deposit of fiduciaries, Professor Merril, in an able article in 40th Harvard's Law Review, 1077, makes the following comment concerning the opinions of courts upholding the doctrine: "Upon the point of notice they have laid much emphasis on the fact that the transaction is on its face a use of the fiduciary's authority to transfer his principal's funds into what is normally a repository for the fiduciary's own funds alone. In the overwhelming majority of instances, one places money in his personal bank account to use as his own and for his own purposes. The deposit of fiduciary funds in such an account, it is said, must therefore be regarded as equivalent to a declaration of intent to devote them to personal ends. Hence the bank should be regarded as having full notice of the fiduciary's intended misappropriation. The rules as to conscious participation in a breach of trust are thus made applicable. Added support is derived from the analogy of the liability of one taking in payment of the fiduciary's own debt checks drawn or indorsed by the fiduciary in that capacity. The tradesman who sells groceries to the unfaithful agent or trustee and accepts in payment therefor a check drawn or indorsed by him as fiduciary must refund to the principal the money so received. The banker's position is practically the same. His commodity is deposit credit. This he has extended to the fiduciary in exchange for a check drawn or indorsed in such form as would impose liability upon the storekeeper who received it in exchange for potatoes sold to the fiduciary. What difference in principle can be drawn between the sale of potatoes and the sale of credit? Should not the same liability be imposed upon the banker as upon the grocer? Although the application of the analogy has been denied, in some decisions it has been relied upon to sustain the imposition of liability upon the banker, and in logic it seems to the writer to be unanswerable."

We call attention to this particularly for the purpose of showing that the opening of a new account with a treasurer of a corporation personally, with company's funds, is different from the situation in many instances where the courts have held that banks were not liable for deposits of trust funds by trustees to their personal accounts.

In this instance, both the depositor and the bank, in furtherance of fair dealing and legitimate banking transactions, had a simple method of handling this account which would have fully protected the bank, and at the same time have relieved it of the duty of inquiry as to the disbursement of the 'funds. Knowing that the funds belonged to the railway company, and being advised by the face of the checks that Hawkins was the treasurer of the company, the plainly sensible and safe method was to place the funds to the account of Hawkins as treasurer. Had this been done, Hawkins could have drawn the money from the bank upon his checks as treasurer ad libitum, and the bank would have been under no duty to inquire as to how the money was being expended. Interstate National Bank v. Claxton, 97 Tex. 569, 80 S.W. 604, 65 L.R.A. 820, 104 Am.St.Rep. 885. In addition, it is obvious that if the bank had, when first approached by Hawkins, suggested the foregoing method of handling this account, or had inquired of Hawkins as to his authority to open a personal account with cashier's checks belonging to the railway company, it would have in all probability resulted in discovering his wrongful misapplication of these funds and would have prevented further misappropriations.

Some of the cases holding nonliability on the part of a bank say that the bank has a right to presume that the trustee will honestly disburse the funds after the same have been placed to his personal account. The presumption of honesty suggests, first, that a treasurer of a railway company will be scrupulously careful in the matter of paying out company funds and will follow the customary prescribed method for doing so, to wit, by opening an account in his name as treasurer and drawing checks in that capacity. When, therefore, Hawkins, a stranger to the bank, proposed opening a personal account with company funds, the act was so out of harmony with the usual conduct of a careful and conscientious treasurer as to arouse suspicion. The defendant, having failed to avail itself of the first suggestion prompted by the presumption of honesty, should not be heard to claim the benefit of such presumption after having voluntarily placed it within the power of the unfaithful official to accomplish his dishonest design.

■■ The question is one of sound public policy, and is not governed by stare decisis. Therefore, we believe that in a case of this kind, it is a sound and reasonable rule to hold that the facts alleged in plaintiff's petition (which must be taken as true) were sufficient to put upon the defendant the duty of inquiry to ascertain the authority of Hawkins to appropriate to his own account the checks in question; and the trial court erred in sustaining the general demurrer.

As having a special relation to the question decided, we call attention to the following cases: Kansas City Casualty Co. v. Westport Avenue Bank, 191 Mo.App. 287, 177 S.W. 1092; Mitchell v. First National Bank, 203 Ky. 770, 263 S.W. 15; Charles A. Hill & Co. v. Belmont Heights Baptist Church, 17 Tenn.App. 603, 69 S.W.(2d) 612; Oklahoma State Bank v. Galion Iron Works (C.C.A.) 4 F.(2d) 337; Standard Steam Specialty Co. v. Corn Exchange Bank, 220 N.Y. 478, 116 N.E. 386, L.R.A. 1918B, 575; McIntosh v. Detroit Savings Bank, 247 Mich. 10, 225 N.W. 628.

We may appropriately add here that this court in the case of United States Fidelity & Guaranty Co. v. Adoue & Lobit, supra, held that "a bank which receives from a guardian money belonging to the ward's estate upon certificate of deposit in the name of the depositor as guardian, is charged with notice from the form of deposit that it is dealing with a trust fund, though without other notice of the character of the fund, or that the depositor is a guardian, or for whom." In that case the bank was also held liable for $5,000 of the trust fund which it placed to the personal credit of the guardian, and which the guardian on the same day paid out by check drawn to his brother, upon this point the court saying:

"But it is urged that, in any event, as to the $5,000 paid out to Compton's brother, which had been by Adoue & Lobit transferred to Compton's personal credit and account, no recovery should be had.

"We think it might well be held that, in view of the defendants' appropriation of the larger part of the trust fund to payment of their personal debt that this vice should give color and character to their treatment of the whole fund. However this may be, it is well settled in the authorities, and is in accordance with sound legal reason, that when, with knowledge of the trust character of the funds, the bank permits a diversion thereof and aids in the appropriation of same to the trustee's personal debt, that it is, and of right should be, held liable. This is clearly held in Duckett v. National Me-

chanics' Bank, 86 Md. 400, 38 A. 983, 39 L.R.A. 84, 63 Am.St.Rep. 513, where the court say: 'And if loss ensued by reason of Clagett drawing the fund out by checks on his personal account, the bank is liable.' And again in that case the court say: 'Its act in placing distinctly marked trust funds to the *personal* credit of Clagett was *obviously* wrongful, and it must bear the resulting consequences.'" (Italics by the court.)

The decision is therefore strongly analogous, and the additional considerations existing here unquestionably justify and support the conclusion reached.

The judgments of the trial court and of the Court of Civil Appeals are set aside, and the cause is reversed and remanded.

Opinion adopted by the Supreme Court.