## CITY NAT. BANK OF WICHITA FALLS, TEX., v. WICHITA ROYALTY CO. et al.

No. 358.

District Court, N. D. Texas, Wichita Falls Division.

April 9, 1937.

See, also, 18 F.Supp. 609.

Bullington, Humphrey & King, and Weeks & Morrow, all of Wichita Falls, Tex., for plaintiff bank and certain interpleaded defendants.

T. R. Boone, of Wichita Falls, Tex., for J. T. Harrell.

Kilgore & Rogers, of Wichita Falls, Tex., for Wichita Royalty Co. and E. E. Scannell.

Arch Dawson, of Wichita Falls, Tex., for W. H. Peckham and others.

ATWELL, District Judge.

This case has its birth in a trust executed in 1920 by R. R. Robertson, and filed in Wichita county on August 27, 1920. He resigned as trustee on January 2, 1923. G. W. Peckham was appointed by the district judge of the Thirtieth judicial district of Texas and continued until his death on the 7th, of November 1929. E. E. Scannell succeeded Peckham on November 12, 1929, receiving his appointment in the same manner. Scannell had been connected with the operations of the trust since Robertson's regime.

The general purpose of the trust was to buy and sell oil and gas royalties and other oil and gas properties. It provided for a million shares at a dollar each. About 1,300 people throughout the United States and distant from Wichita Falls became stockholders. The trust provided that there should be no liability as to the stockholder and that he should have no right to do anything for the trust nor was he entitled to any property, but only to a division of profits and at the expiration of the term of the trust, which was to last for twenty years, to a division of principal and profits. It was to be managed by one trustee. All investments were to be in the name of the trustee, as trustee, and all titles were to be so taken. The trustee was given authority to acquire any property necessary or proper for the purpose of the trust. Any demand on account of the operation and business of the trust was to be paid. The trustee was liable only for willful and corrupt breach of trust, and not for any honest error of judgment.

The complainant instituted a suit in 1930 in the state court against the trust and its trustee, Scannell. It declared upon a $22,000 note, two $5,000 notes and a $23,500 note. Liens were asserted for their security. In February, 1931, the trust and Scannell admitted Scannell's execution of the $22,000 note, but pleaded certain apologies therefor and claimed that it was executed upon certain representations and assurances of J. T. Harrell, who was at that time an officer of the bank.

In February, 1931, the trust answered more fully and impleaded J. T. Harrell and made cross-complaint against the bank for benefits alleged to have been received by that institution from trustee Peckham out of the moneys of the trust.

On February 25, 1932, judgment was rendered for the plaintiff for the $22,000, also for $14,596 and against the defendant's cross-action, and for the executors of the estate of J. A. Kemp, who was claimed to have been a silent partner of Harrell and Peckham, and who was dead.

On May 14, 1936, the cause having reached the Supreme Court of Texas where it was reversed, the mandate was received.

On June 18, 1936, the trust and Scannell, the latter as trustee and as one of the 1,300 stockholders, amended and sought such remedies against the old bank, it having gone into liquidation in March, 1933, and its successor, the liquidating agent of the old bank, the stockholders of the old and the new banks, and the estate of Peckham, that, application to remove, as an effort to wind up the affairs of a national bank, to this court, was made, where, later on, a motion to remand was overruled. See 18 F.Supp. 609.

The cause was then repleaded, and the court having been advised by both parties that a commissioner would be advisable

to take testimony, an order was accordingly made and T. C. Irby was so appointed.

Upon the trial something over 3,100 pages of testimony were introduced, filling nineteen volumes, as taken from ten witnesses. There were many exhibits, among which are 221 checks, of which only 72 appear to bear on the matters. In this record there are many repetitions and considerable confusion in the offering of the testimony. I mean by confusion, the same witness would be recalled at different periods and take up different transactions, or treat the same transaction that had been developed by some other witness so that it has required considerable labor on the part of counsel and court in sifting out the exact truth of the story. The pages for this story come out of the past, and some of them were written fourteen years ago and most of them more than ten years ago. The chief actor, G. W. Peckham, is dead.

The transactions known as the Grimshaw Royalty, the Wilson Royalty, the White lease, the Routon Royalty, the South Anderson ranch, the Millner oil payment, the Curtis Lane property, the Callahan Royalty, the Porter ranch, the Anderson ranch in Ellis county, Okl., the Hartley county item, the Marlborough addition, and a Studebaker car, are the principal battle grounds. With reference to these Carson and Lambert for the bank and Wallace for the respondents, aided volubly by trustee Scannell, offered the bases for what must be taken as the proper solution. There are some aids to Carson and Lambert in Harrell and Bomar and Dickson's testimony.

Some of these properties the court finds to have been taken in the name of Peckham. As to such as were so taken there were minute memoranda furnished to and inscribed on the records of the trust and in most, if not all instances, reported to the stockholders in periodical communications from the trustee. Such communications are shown in the record with the exception of one in June of 1926, which was the date of the first report after the acquisition of the Marlborough property. If it be conceded, which the court does not find, that there was any profit to Peckham on either of the above transactions, except Marlborough, which is treated later, and one other small item, then and in that event the court finds that the complainant in this case was not a party thereto and is not chargeable therewith. The trust made money for the stockholders, who have been paid something like 118 per cent. on their investment.

The court further finds that after Peckham's death the succeeding trustee, Scannell, and Peckham's brother, who was the administrator of the deceased Peckham, agreed, after Scannell had discovered an alleged shortage of $19,000, that that amount could be paid out of Peckham's $100,000 life insurance, and that nothing would be said about it. While this concealment was effective, and, observed, the Texas state statute requiring the filing and presentment of claims in the probate court having charge of the deceased estate, within ninety days, was probably tolled, but when the claim for that amount was filed in that estate the agreement to conceal was abrogated. After the disallowance of that claim by the probate court no proceedings were taken against Peckham's estate until this cross-action was filed in 1936. The Texas statute and the decisions thereunder with reference to such matters bars the right to enter court under circumstances of that sort, and, in truth, announce that the claim no longer exists—it is extinguished by such failure to act within the time. Article 3522, Tex., R.S.1925. Therefore, whatever amounts may have been due by Peckham to the trust by reason of such transactions are not recoverable in this action, and this includes a profit of $4,000 alleged to have been made by Peckham in the Marlborough transaction.

Peckham kept his account in the old bank. That bank was also the depository for the trust. Peckham was an active operator in the oil fields and in the real estate world. His deposits in his individual account during the time of his trusteeship were more than a million and six hundred thousand dollars, and included hundreds of transactions. Under the trust he could have kept in his private account the funds belonging to the trust. There are no legal inhibitions to a trustee, empowered as here, to use himself as a conduit for either property or funds from strangers to the trust. Such a course is unwise and subjects each transaction to the critical scrutiny, not to say suspicion, of interested parties, particularly the court. It must be borne in mind that in this trust the trustee had the widest powers, and was responsible only for dishonesty and not for errors of judgment. He was bounden to ultimately fix the title to that which

was required for the trust in himself as trustee. It would hardly be judicial to suggest that the time for such fixing is not itself fixed, but we may fairly say that the raising of eyebrows could be prevented by doing this upon the acquisition of the property.

■ The court has been unable to find any dishonest transaction by trustee Peckham. The court has found the payment of some of his indebtedness to the old bank out of funds of the trust. When a transaction of that sort takes place, I think the bank has the burden of making inquiry. It is unnecessary to review the richness of the authorities upon the question, but I do not agree that they are marshaled in accordance with the prevalent rule in the national courts in the opinion of the supreme court in the first trial of the cause. The case of American Surety Company v. Waggoner National Bank (C.C.A.) 83 F.(2d) 99, from the Fifth Circuit, which affirmed (D.C.) 13 F.Supp. 295, seems to bear upon the questions here. Attention is also called to Empire Trust Company v. Cahan, 274 U.S. 473, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921.

The opinion, In re Wichita Royalty v. City National Bank (Tex.Sup.) 89 S.W. (2d) 394, uses Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A.1916F, 1059. Almost simultaneous with the decision in 89 S.W.(2d) 394, was the decision of Quanah, Acme & Pacific v. Wichita State Bank & Trust Co. (Tex.Sup.) 89 S. W.(2d) 385. But the supreme court, in the Quanah Case, 93 S.W.(2d) 701, 106 A.L. R. 821, seems to have discarded the negligence rule as to the liability of depositories and to have grounded such liability upon the question of good faith.

■ But regardless of those cases the consensus of judicial opinion at the present time, in the absence of bad faith, seems to rest upon the facts which disclose business as ordinarily conducted. In other words, the bank was not charged with any duty to require Peckham to disclose where the funds came from that were in his personal account, nor to require him to account to it for the funds that were in the trust account, in the absence of any definite information as to illegal or improper deposits or withdrawals.

■ The trust put its moneys and deposits at the disposition of the trustee Peckham. They were in his power. No one else had anything to do with them. No one else had any say about them. If he drew them out he could do so as he saw fit. Such notice as the bank had was notice only of this relation between the parties. The bank in permitting the trustee to draw out trust funds was only doing what the trust itself declared the trustee had a right to do, and the bank was not bound to ask even if the deposit had been earmarked as a trust. The method or form of withdrawals is immaterial. They could have been drawn out on the check of the trustee. All that need to be known under this branch of the ·law—considered reasonably and carefully—is whether the bank got the benefit of trust funds. If it did it is liable to respond, and the fullness of the rule just mentioned does not apply.

■ In Exhibit B to Wallace's testimony are fifteen items, from June 22, 1923, to June 12, 1929, which he claims were payments to the bank out of trust funds on Peckham's personal debts. Another item of approximately $2,550 is also claimed. These total $13,281.59. Of these, four relate to salary checks which were manifestly his. The other items, save and except the sum of $1,807.11, which witness Lambert concedes and which witness Carson does not question, seem to be wrongly so placed. In weighing Carson and Lambert against Wallace I have taken into consideration the fact that Carson has gone into exhaustive detail—having spent many months in the examination, as has also Lambert. Wallace spent a much shorter time and seems to have been misled, at any rate, to some extent, by confusion resulting from his determination to charge to Peckham, as improper withdrawals, approximately $30,000 in salary. There are conditions when salary will be denied a trustee. I do not find those conditions present in this case. I have been doubtful about the $2,550. When one is doubtful, and as doubtful as the maze of facts in this case causes, I believe the trust should be given the benefit of it in so far as it concerns a payment out of funds to the depository bank by the trustee on his own debt. That makes a total of $4,357.11, which I find to have been so improperly paid. This sum must bear, in justice, the same rate of interest that the bank was charging on the loan, to wit, 8 per centum, and it should begin to run January 1, 1926.

This date is rather optional, but it seems to be fair to all parties. The sum to be deducted from the $22,000, claimed by the complainant, is, therefore, $8,278.50, which leaves a balance due it, on that note, of $13,721.50.

When the case went to the higher state courts from the first trial, trustee Scannell, and the trust, made certain claims against the bank by reason of the Marlborough transactions. That investment was one apparently outside of the sort of properties that the declaration authorized the trustee to deal in. But he dealt in good faith, in so far as showing such dealing in the records of the trust is concerned. It was not a good-faith dealing in so far as he, himself, made a profit of $4,000 is concerned. Scannell claimed, at that trial, that a deed had been given to the trust by Peckham, but that Peckham had cautioned him to keep it quiet, and under his testimony, it appeared not to have been a legal delivery to his principal, the trust, a claim dissipated at this trial.

Under this rule of the bank's bounden duty to take notice when it receives benefit, even though Harrell be acquitted of any impropriety, there was a direct benefit to the bank out of the $25,-000 loan to the trust. Connecticut Fire Ins. Co. v. Commercial National Bank (C. C.A.) 87 F.(2d) 968. It is unnecessary to recite the immediate details that followed the placing of that credit. They are sufficient to take from the complainant any right to recover here. It has not discharged the burden that rests upon it to make out its case by a preponderance of the testimony. I do not mean to say it would figure out in exact pennies, but I do mean to say that the denial of its right to recover is proper. Likewise, there is no other merit in the cross-action. The burden that rested upon the trust to show the chancellor has, likewise, been undischarged.

I have already indicated that the record is unpardonably extended, and it seems to me appropriate that the decree should go that neither the complainant nor the respondent take anything, and that the costs shall be equally divided between the bank and the trust without costs as to the Peckham estate, Harrell, or any of the other natural persons.